UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RYAN WILLIAMS, ET AL., | : | CASE NO. 3:01CV1398 (JGM) |
| *Plaintiffs*, | : | |
| | : | |
| v. | : | |
| | : | |
| KRISTINE RAGAGLIA, ET AL., | : | |
| *Defendants*. | : | March 16, 2005 |

## DEFENDANTS' RULE 56(a)(1) STATEMENT OF FACTS

### BACKGROUND

1. The plaintiff, Benjamin Ohene, is a black male, who was born in Ghana. He is also a former resident of the state of Connecticut. (Ex. 1, Complaint, ¶ 3, I; Ex. 25, Excerpts from Deposition of Benjamin Ohene, dated September 23, 2002 [hereinafter "Ohene Depo."], p. 22:2-8).

2. Defendant Michael Wood, a black male, is a resident of the state of Connecticut and is currently employed as a Principal Personnel Officer for the Connecticut Department of Children and Families (hereinafter "DCF"). (Ex. 3, Affidavit of Michael Wood, dated March 1, 2005 [hereinafter "Wood Aff."], ¶¶ 2-3).

3. Michael Wood never supervised the plaintiff. From 1996 to 1998, Mr. Wood served as a Personnel Officer 2 who was assigned to assist with Labor

1

Relations matters for the DCF southwest region, which includes DCF offices in Bridgeport, Norwalk and Stamford. (Ex. 3, Wood Aff., ¶¶ 4-6).

    4.    Defendant Dorothea Hamilton is a resident of the state of Connecticut and is a former employee of the Connecticut Department of Children and Families. (Ex. 5, Affidavit of Dorothea Hamilton, dated February 25, 2005 [hereinafter "Hamilton Aff."], ¶ 2).

    5.    From 1998 to 2001, Dorothea Hamilton served as Program Supervisor in the Bridgeport office of DCF. Her responsibilities included overseeing the Social Worker Supervisors, who in turn supervised the social workers and trainees in three treatment units working out of the Bridgeport office. (Ex. 5, Hamilton Aff., ¶¶ 4-6).

**PLAINTIFF'S WORK HISTORY**

    6.    Benjamin Ohene was hired as a social worker trainee on July 18, 1994. After completing his training he was assigned to Bridgeport office in the Southwest region of DCF. (Ex. 6, Letter of Employment, dated July 18, 1994; Ex. 25, Ohene Depo., p. 11:15-22)

    7.    Mr. Ohene's initial supervisor was Dee Rice. He was supervised by Ms. Rice for about seven months. (Ex. 25, Ohene Depo., p. 12:1-17).

    8.    After seven months, Mr. Ohene was transferred to a DCF treatment unit within the Bridgeport office. (Ex. 25, Ohene Depo., p. 12:17-

23). While assigned to the treatment unit he was initially supervised by a white male Social Worker Supervisor. (Ex. 25, Ohene Depo., pp. 24:25-25:4).

9. In 1995 and extending through part of 1998, Mr. Ohene was supervised in the Treatment Unit within the DCF Bridgeport office by Elizabeth Anderson, a black female. All of the social workers in this unit happened to be minorities. (Ex.25, Ohene Depo., pp. 14:16-15:19; p. 37:5-12).

10. Elizabeth Anderson was supervised by Program Supervisor, Anne Christy. (Ex. 25, Ohene Depo., p. 63:6-9).

11. On two occasions in May 1996, the plaintiff was counseled by Ms. Anderson about the need to complete his work in a timely fashion. (Ex. 7, Memo to Ohene dated May 15, 1996; Ex. 8, Memo to Ohene, dated May 30, 1996).

12. On September 2, 1996, Ohene was counseled to complete work that was overdue. (Ex. 9, Memo to Ohene, dated 9/5/96).

13. On October 2, 1996, the plaintiff was again counseled by Ms. Anderson in writing about deficiencies in completing his work, updating narrative case notes and closing files in a timely manner. (Ex. 10, Memo to Ohene, dated 10/2/96; Ex. 11, E-mail to Ohene from Gayle Hoffman, undated).

14. In October 1996, Mr. Ohene received a performance appraisal for the period covering February 1995 to September 1996. Ms. Anderson rated Ohene as satisfactory. Ms. Anderson noted several areas of concern

3

pertaining to the plaintiff's judgment, quantity of work, ability to accept supervision and maintaining accurate client case narratives. (Ex. 12, Performance Evaluation, dated 10/96, pp. 3-4).

15. On January 19, 1997, the plaintiff, his supervisors and Michael Wood, attended a meeting during which it was agreed that the plaintiff had to complete certain work that was overdue. (Ex. 13, Memo to Ohene, dated January 19, 1997).

16. In February 1997, Ms. Anderson again reminded Ohene of his job duties regarding a his role as asocial worker in the treatment unit. (Ex. 14, Memo to Ohene, dated 2/7/97).

17. On April 10, 1997, Ohene met with his supervisors to discuss various performance problems related to his handling of cases in a timely manner. (Ex. 15, Memo to Ohene, dated 4/10/97).

18. On July 8, 1997, Ohene was issued a letter for warning for work deficiencies relating to updating case narratives, treatment plans and closing files. (Ex. 16, Letter of Warning, dated 7/8/97).

19. On April 29 1998, the plaintiff was issued a written warning for threatening a Program Supervisor, Ms. Anne Christy. (Ex. 17, Letter of Warning, dated 4/29/98).

20. In September 1998, the plaintiff received only a "fair" performance appraisal. The appraisal noted numerous problems with Mr.

Ohene's work related to his judgment, failure to follow directives, lack of initiative, etc. (Ex. 18, Performance Appraisal, dated 9/30/98).

21. The plaintiff complained about his supervisor and Mr. Ohene was reassigned to a training unit along with two white social workers, one female and one male. He was then supervised by a different Social Worker Supervisor, Ms. Jacquline Adams, a black female. (Ex. 25, Ohene Depo., pp. 43:17-45:3; pp. 62:19-63:2).

22. Ohene was transferred within the same office and kept the same title, job classification and pay rate. (Ex. 25, Ohene Depo., pp. 45:16-46:6).

23. Ms. Adams was supervised by Program Supervisor Dorothea Hamilton, a white female. (Ex. 5, Hamilton Aff., ¶¶ 6-7; Ex. 25, Ohene Depo., p. 33:13-14).

24. On August 10, 1999, the plaintiff was issued a letter of warning for his continued failure to complete required work in a timely manner and for poor attendance. (Ex. 19, Letter of warning, dated 8/10/99).

25. In September 1999, the plaintiff was issued an unsatisfactory performance appraisal by Ms. Adams. In the appraisal Ms. Adams noted numerous deficiencies with Mr. Ohene's work performance. (Ex. 20, Performance Appraisal, dated 9/29/99).

26. The plaintiff was subsequently transferred back to another treatment unit and was initially supervised by a black female, Patricia

5

Goyette. Ms. Goyette retired shortly thereafter and Dorothea Hamilton took over. (Ex. 25, Ohene Depo., pp. 62:19-63:14).

27.     According to Mr. Ohene, Ms. Hamilton only supervised him for two weeks. (Ex. 25, Ohene Depo., p. 40:10-15).

28.     On at least one occasion in 2000, Dorothea Hamilton was covering for Mr. Ohene's supervisor. She met with a client to discuss a treatment plan. During that meeting the client reported that she had never seen her social worker (Ohene) despite narrative reports filed by Ohene describing alleged home visits. (Ex. 5, Hamilton Aff., ¶ 10; Ex. 25, Ohene Depo., pp. 65:9-23).

29.     Dorothea Hamilton determined that Ohene had been untruthful about making home visits as reported by him in his case narratives. (Ex. 5, Hamilton Aff., ¶ 10).

30.     On March 21, 2000 the plaintiff was terminated from DCF for poor work performance. (Ex. 25, Ohene Depo., pp. 63:15-64:5; p. 65:9-23). Ohene does not attribute the decision to terminate him to Dorothea Hamilton. (Ex. 25, Ohene Depo., p. 63:15-17).

31.     The plaintiff grieved his dismissal. On February 2, 2001, the plaintiff entered into a "Last Chance Stipulated Award," whereby he was reinstated into his former position as a social worker. As part of that agreement, the plaintiff agreed not to sue the State of Connecticut regarding his termination. (Ex. 21, Last Chance Stipulated Award, dated 2/2/01).

6

32. As part of the Last Chance agreement, the plaintiff was transferred to the Stamford area (Norwalk office). (Ex. 21, ¶ 3; Ex. 25, Ohene Depo., p. 17:9-18).

33. While employed in the Bridgeport office, the plaintiff never conducted any type of investigation about case loads for social workers or the work performance of other social workers. (Ex. 25, Ohene Depo., p. 39:5-25).

34. While assigned to the Stamford office, Mr. Ohene was supervised by Social Worker Supervisor Phyllis Gilliam, a black female. (Ex. 25, Ohene Depo., p. 17:13-21).

35. In February 2001, a client reported that Ohene had cursed at her son during a home visit. An investigation was conducted and the charge was sustained. Ohene was given a formal counseling about his behavior. (Ex. 22, Report of Investigation, dated 3/27/01).

36. Also in February 2001, Ohene received an unsatisfactory service evaluation by yet another DCF social worker supervisor from the Stamford Office, Ms. Gillian. (Ex. 25, Ohene Depo., pp. 41:6-42:7; p. 67:2-10).

37. On April 19, 2001, Ohene was charged with neglect of duty, poor role modeling and poor judgment. He persistently failed to perform his required duties. In this matter, he failed to visit the home of a child reunited with his/her family and failed to follow through on a recommended treatment plan. (Ex. 23, Investigation Report, dated 5/15/01).

7

38. In July 2001, Ohene was scheduled for a pre-disciplinary hearing to discuss the investigation into his conduct. (Ex. 23, Letter to Ohene, dated 7/12/01).

39. In July 2001, Ohene voluntarily resigned from DCF. He was not terminated. (Ex. 25, Ohene Depo., p. 27:7-16).

40. During his employment at DCF, Benjamin Ohene never took the examination for promotion, nor did he ever apply for promotion. (Ex. 25, Ohene Depo., p. 29:2-17).

41. The plaintiff does not contend that defendant Michael Wood denied him a promotion. (Ex. 25, Ohene Depo., pp. 29:19-30:2; p. 34:1-17).

42. Defendant Michael Wood's only involvement with Mr. Ohene was to hear various grievances Ohene filed prior to June 1998. Michael Wood had no authority to discipline Mr. Ohene and never did so. (Ex. 3, Wood Aff., ¶¶ 6-7, 10 & 12).

43. According to Ohene, most of the different DCF supervisors who interacted with him, Ms. Anderson, Ms. Christy, Ms. Hamilton, Ms. Adams and Ms. Gilliam expressed concerns about Ohene's work performance. ( Ex. 25, Ohene Depo., pp. 43:3-7).

44. Ohene claims that DCF worker Jacqueline Adams called him "learning disabled." Ms. Adams is not a defendant in this case. (Ex.25, Ohene Depo., p. 32:7-14; p. 47:7-18).

45. Ohene claims that Elizabeth Anderson and Jacqueline Adams subjected him to harassment and emotional trauma, but neither are defendants in this case. (Ex. 25, Ohene Depo., p. 32:11-14; pp. 48:12-49:25).

46. Non-minority white social workers in the Bridgeport office of DCF were also counseled and criticized for poor work performance. (Ex. 25, Ohene Depo., p. 57:13-24).

47. Ohene is aware of at least one other social worker, a white male, who received an unsatisfactory service rating for poor work performance. (Ex. 25, Ohene Depo., pp. 56:18-57:7).

**STATISTICAL EVIDENCE**

48. The plaintiff does not plead that he ever filed a complaint of discrimination against DCF with either the CHRO or EEOC. (Ex. 1, Complaint).

49. In 2001, Local Union 2663, which represents the P-2 bargaining unit covering social workers and social worker trainees, filed a CHRO complaint alleging that black male social workers were being disproportionately disciplined. The CHRO requested raw statistical data about the number of DCF employees disciplined between 1996 and 2000, stratified by race, gender and job classifications within the regions. (Ex. 4, Affidavit of Lynn Paton, dated February 23, 2005 [hereinafter "Paton Aff."], ¶ 5; Ex.26, Excerpts from deposition of Salvatore Luciano, dated October 28, 2004 [hereinafter "Luciano Depo."], p. 26:5-16).

50.  Since all disciplinary actions come through the DCF Labor Relations unit, Lynn Paton, the Assistant Agency Personnel Administrator 3 for DCF, prepared the statistical data requested by both the union and the CHRO showing the number of warnings, reprimands, demotions, suspensions and dismissals by race, gender and job classification. (Ex. 4, Paton Aff., ¶ 6).

51.  The data provided, a copy of which is attached to the affidavit of Lynn Paton (Addendum "A" to Ex. 4), did not attempt to apply a statistical methodology to draw any statistical inferences. No attempt was made to eliminate non-discriminatory reason for any perceived statistical disparity. (Ex. 4, Paton Aff., ¶ 7).

52.  Employees, including line managers, move around within DCF with some frequency. The raw data does not attempt to correlate disciplinary actions to any specific manager or employee in any region. (Ex. 4, Paton Aff., ¶¶ 7, 9).

53.  Under the collective bargaining agreement for the P-2 classifications, before an employee is disciplined, the agency investigates the matter, a pre-disciplinary hearing is held in the presence of a union representative. Often through this informal process, contemplated discipline is dismissed or modified. Once discipline is imposed, the employee can avail

himself/herself of the grievance process that includes several steps, and if appropriate, arbitration. (Ex. 4, Paton Aff., ¶ 8).

54. The raw data compiled by Ms. Paton was not case specific. Each case is different, potentially involving different facts, employees, job functions and managers from the various DCF regions. (Ex. 4, Paton Aff., ¶ 9).

55. Within the raw data were all the cases in which discipline was imposed without taking into account those cases in which more harsh discipline was contemplated and then reduced by agreement, cases in which the employee did not contest the discipline, or, in some instances, repeat offenders. (Ex. 4, Paton Aff., ¶ 10).

56. In Ms. Paton's experience of over ten (10) years in labor relations at DCF, she has witnessed numerous social workers, white and black, male and female, being disciplined for poor work performance and violations of work rules throughout the different DCF regions. Other employees, similar to Benjamin Ohene, have been disciplined for various violations of DCF policies. (Ex. 4, Paton Aff., ¶ 11).

57. Benjamin Ohene has a long history of performance problems. He received numerous oral and written counselings for work-related problems. He filed grievances over each warning received for poor work performance. All of his grievances were denied. (Ex. 4, Paton Aff., ¶ 12).

58.   Salvatore Luciano is the Executive Director of AFSCME Council 4, which includes Local 2663, the union covering the social workers at DCF, such as Benjamin Ohene. (Ex. 26, Luciano Depo., p. 6:14-18; p. 6:21-7:7).

59.   Sal Luciano was the union President of Local 2663 for 12 years. (Ex. 26, Luciano Depo., p. 8:20-25).

60.   Mr. Luciano has no specialized training in statistical analysis. (Ex. 26, Luciano Depo., p. 10:8-20; pp. 33:11-34:15).

61.   In 2001, Mr. Luciano requested some information from DCF about the number of social workers disciplined by DCF between 1996 and 2000. DCF provided raw numbers to Luciano broken down by gender, race and job classification. (Ex.26, Luciano Depo., pp. 14:11-15:21).

62.   The information provided were raw numbers, without names. Mr. Luciano could not match up, case by case, any statistics to specific individuals. (Ex. 26, Luciano Depo., pp. 16:1-18:4).

63.   Mr. Luciano did a straight math application to get the relative percentages of the number of disciplines in each category. (i.e. black males). Mr. Luciano never used any type of methodology to eliminate non-discriminatory reasons for any perceived disparity he thought existed. (Ex.26, Luciano Depo., pp. 18:8-25:24).

64.   In his experience, Luciano has represented many union members in disciplinary matters. He agrees that in his experience, cases can be broken down into the following categories, (1) disciplinary actions that are

12

warranted; (2) discipline is warranted but the result is harsher than necessary; (3) cases in which he believes no discipline is warranted. (Ex. 26, Luciano Depo., pp. 22:10-23:9).

65. The union, Local 2663, never had any expert perform any type of statistical analysis to eliminate from the raw data cases in which discipline was warranted or to eliminate non-discriminatory reason for any perceived statistical disparity. (Ex. 26, Luciano Depo., pp. 23:10-25:24).

66. On June 4, 2001, CHRO Assistant Commission Counsel Robert Brothers Jr. reported to Cynthia Watts Elder, the Executive Director of the CHRO, that while there appeared to be an inconsistency in the ratio of discipline for certain classes within DCF, he did not conduct a statistical analysis to provide a reason for the perceived disparity. (Ex. 27, Memo to Cynthia Watts Elder, dated 6/4/01).

67. While Mr. Brothers simply noted the difference in ratios, he stated: **"There is insufficient evidence to identify any given reason for the above finding. . . Note: The commission finds nothing wrong with the numbers and simply notes as a matter of fact the agency is almost 70% female."**  (Ex. 27, p. 3).

68. According to Mr. Luciano, the CHRO did not find discrimination. (Ex. 26, Luciano Depo., p. 29:2-18).

69. Mr. Luciano is not aware of any study from which a statistical conclusion has been reached that DCF has discriminated against minority employees. (Ex. 26, Luciano Depo., pp. 30:11-23).

70. Mr. Luciano is not aware of any study that attributes discriminatory behavior to any of the 20 plus individual defendants in this case. (Ex. 26, Luciano Depo., pp. 30:24-32:23).

71. Mr. Luciano agrees that in order to create a statistically valid inference of discrimination, the methodology should eliminate non-discriminatory reasons that might explain or influence any statistical anomaly. (Ex.26, Luciano Depo., pp. 36:6-38:15).

72. Benjamin Ohene in this case has never disclosed any expert designation regarding alleged statistical inferences that can be drawn from any raw statistical information from DCF that can be imputed to any one of the individual defendants. (Exhibit 28, Affidavit of Joseph A. Jordano, dated March 9, 2005).

73. During her nineteen (19) years of employment, Dorthea Hamilton was never aware of any policy, practice or custom of disciplining black male social workers more harshly frequently than other employees. (Ex. 5, ¶ 16).

74. In his response to interrogatories, from the 20 or so named defendants, the plaintiff identifies only Dorothea Hamilton and Michael

Wood as individuals who allegedly committed discriminatory acts. (Ex. 2, Response to Interrogatory No. 3).

75. The plaintiff does not identify any wrongful acts by defendant Kristine Ragaglia, who is apparently named as a nominal defendant. (Ex. 2, Response to Interrogatory No. 3).

76. In 2000, DCF employed over 3,400 people in the Bridgeport office, 646 of which were managers. (Ex. 4, Paton Aff., Exhibit A, p. 10).

DEFENDANTS,

RICHARD BLUMENTHAL
ATTORNEY GENERAL

BY: _____
Joseph A. Jordano
Assistant Attorney General
Federal Bar # ct21487
55 Elm Street, P.O. Box 120
Hartford, CT 06141-0120
Tel: 860-808-5340
Fax: 860-808-5383
email: Joseph.Jordano@po.state.ct.us

**CERTIFICATION**

The undersigned hereby certifies that on the 16th day of March, 2005, a true and accurate copy of the foregoing was sent by United States mail, first class postage prepaid, to the following:

Francis A. Miniter, Esq.
Miniter & Associates
100 Wells Street, Suite 1-D
Hartford, CT  06103

_____
Joseph A. Jordano
Assistant Attorney General