UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RYAN WILLIAMS, ET AL., | : | CASE NO. 3:01CV1398 (JGM) |
| *Plaintiffs,* | : | |
| | : | |
| v. | : | |
| | : | |
| KRISTINE RAGAGLIA, ET AL., | : | |
| *Defendants.* | : | March 16, 2005 |

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGEMENT AS TO PLAINTIFF BENJAMIN OHENE

### INTRODUCTION

The plaintiff, Benjamin Ohene, is a former employee of the State of Connecticut, Department of Children and Families ("DCF").  In July 2001, Ohene voluntarily resigned his position after a long history of performance issues dating back to before 1996.  His lawsuit alleges § 1981 and § 1983 actions against defendants Kristine Ragaglia, Dorothea Hamilton and Michael Wood.[1] There is also a state law claim against the same defendants for intentional infliction of emotional distress. Ohene alleges that he was denied a promotion and suffered disparate treatment because of his race, ethnic origin, color and gender. (Ex. 1, Complaint, ¶ 99-104). The plaintiff has no claim against his former employer

---

[1]   In his response to interrogatories, from the 20 or so named defendants, the plaintiff identifies **only** Dorothea Hamilton and Michael Wood as individuals who allegedly committed discriminatory acts. The plaintiff does not identify any wrongful acts by defendant Kristine Ragaglia, who is apparently named as a nominal defendant, though sued personally.

under Title VII because he never filed a charge of discrimination with the CHRO

or EEOC as required under both federal and state law.[2]

Much of this plaintiff's testimony shows that he had historical

performance problems while being supervised by both black and white

managers. He also testified to various acts of discrimination that he claims were

perpetrated by individuals who are <u>NOT defendants in this case</u>.  Defendants

bring this to the court's attention because the conduct of the individual

defendants cannot be legally imputed to others absent a recognized theory and

evidence to support the imputation of conduct when all of the individual

defendants have only been sued in their <u>personal capacities</u>. (Third Amended

Complaint, ¶ 4. U.)

## FACTS

Benjamin Ohene hails from Ghana, He was hired as a social worker

trainee by DCF in 1994.  He was assigned to the treatment unit at the DCF

Bridgeport office. His  job as a social worker was to handle cases that involved

treatment services provided through DCF to its clients.  Part of his job included

home visits to client residences and narrative updates of all of the case activity

---

[2]  Count 33 of theThird Amended Complaint set forth a claim by all the plaintiff against DCF
under Title VII for a pattern and practice of disciplining black male employees.  However, these
claims are barred because none of the plaintiffs, except Regina Wilby, filed a charge of
discrimination as required under federal and state law.

into a DCF computer database regarding each client known as the "LINK system."

Throughout his DCF career, according to Ohene, most of his supervisors had concerns about his work performance. Shortly after he began at DCF, Ohene was transferred to a treatment unit in the Bridgeport office.  His supervisor in that unit was Elizabeth Anderson. On numerous occasions, Ms. Anderson expressed concerns about Ohene's work being both untimely and incomplete. Ohene was given counseling and numerous warnings about these and other work deficiencies.  Mr. Ohene states that "across the board," both black and white social workers in his unit received criticism for work deficiencies.

Ohene complained about what he felt was unfair treatment by Ms. Anderson. He was then reassigned to a training unit along with two white social workers, one female and one male, still within the Bridgeport office.  His new supervisor was a black female named Jacqueline Adams.  Ms. Adams also reported numerous problems with Ohene's work performance.  Ohene testified that he is aware of a least one white social worker in his unit who also received an unsatisfactory service rating for poor work performance.

Ohene was subsequently reassigned back to a different treatment unit under a black female supervisor named Patricia Goyette. Ms. Goyette retired shortly thereafter and Dorothea Hamilton, the Program Supervisor, temporarily

supervised Ohene for two weeks or so according to the plaintiff.  While Ohene was being supervised temporarily by defendant Hamilton, he was terminated by the agency for poor work performance and misconduct.   That was Ohene's last involvement with defendant Hamilton.

Ohene grieved his dismissal and, as part of a stipulated agreement between the agency and the union, he was reinstated, given a <u>written</u> <u>last</u> <u>chance</u> <u>agreement</u> and transferred to a different office under yet another supervisor. As part of the stipulated agreement, Ohene released DCF of any liability related to his termination.  It did not take long for Ohene to create problems in his new office.  His performance issues continued along with several behavioral problems.  In February 2001,  his new supervisor, Ms. Phyllis Gillian, gave him an unsatisfactory performance review.  In May 2001, Ohene was charged with neglect of duty and poor judgment. He voluntarily resigned in July 2001.

Although Ohene alleges that he was wrongfully denied a promotion, he admits that he never took the examination for a promotion, nor did he ever apply for a promotion.

Lastly, Ohene claims that his former supervisors, Elizabeth Anderson and Jacqueline Adams, <u>neither of whom is a named defendants in this case</u>, embarrassed him by criticizing him in front of others.

Defendant Michael Wood serves as a Labor Relations Officer for DCF. He has no supervisory authority over social workers and has never disciplined any DCF employee. His role is to observe interviews (referred to as interrogation interviews) of DCF personnel who may potentially be disciplined that could result in a grievance under the applicable union contract. Mr. Wood hears union grievances at Step Two of a four-step process. Between 1996 and 1998, Wood heard several grievances filed by Ohene. Mr. Wood had no other involvement with Ohene. Ohene admits that Wood never denied him a promotion.

The plaintiff's case is premised entirely upon a statistical argument that between 1996 and 2000 black males were disciplined by the agency as a whole at a rate four times that of white female employees regarding warnings, reprimands, demotions, drops and dismissals. However, the plaintiff did not apply any recognized statistical methodology to eliminate legitimate non-discriminatory reasons for such an anomaly. No expert has been retained to: (1) stratify raw data for the social worker classification alone to exclude those cases in which legitimate nondiscriminatory factors (experience, skill sets, job duties, etc). could influence the raw data; (2) correlate any valid statistical inference to any particular region or to an individual defendant; (3) account for the differing percentages of BM and WF social workers within each region; (4) account for repeat offenders within a region; or (5) verify in which years the incidents

occurred during a 4.5 year period. The raw statistical evidence solely for this 4.5

year period shows different percentages in the various regions for the social

worker classification without any analysis.  Lastly, the evidence of the incidents

of discipline (the New Haven office having the most during the 4.5 year period –

32, 11 involving a black male employee) alone does not prove a pattern or

practice under the law that can imputed to any individual defendant.

## ARGUMENTS

### THE PLAINTIFF CANNOT PROVE A CONSTITUTIONAL CLAIM PREMISED ON A VIOLATION OF HIS RIGHT TO EQUAL PROTECTION

As the court is well aware,  Section 1983  does not create any new

substantive rights, but merely provides a federal cause of action for the violation

of certain federal rights.  M. H. By, Through and With His Parents and Next

Friends, Mr. And Mrs. H. v. Bristol Board of Education, 169 F. Supp. 21 (D. Conn.

2001); Mrs. W. v. Tirozzi, 832 F.2d 748, 754 (2d Cir. 1987). In order to prove

violation of his Fourteenth Amendment right to equal protection under the law,

the plaintiff must prove the following elements: (1) he, as compared with other

similarly situated individuals, was selectively treated; and (2) this selective

treatment was motivated by an intention to discriminate based on impermissible

considerations such as race or by a malicious or bad faith intent to injure the

person. Muller v. Costello, 187 F.3d 298, 309 (2d Cir. 1999); Page v. Connecticut

Department of Public Safety, 185 F. Supp.2d 149 (D. Conn. 2002).  "Proof of

racially discriminatory intent or purpose is required to show a violation of the

Equal Protection Clause." Village of Arlington Heights v. Metropolitan Housing

Authority, 429 U.S. 256, 265, 97 S. Ct. 2040, 48 L. Ed. 2d 597 (1976); Patterson v.

County of Oneida, 375 F.3d 206 (2d Cir. 2004).  In order to prove a prima facie

case of race, age or ethnicity discrimination that violates equal protection, Ohene

must demonstrate that he was treated differently from other similarly situated

employees *because of his race, gender or ethnicity*. See, Annis v. County of

Westchester, 136 F.3d 239, 245 (2nd Cir. 1998), citing Sims v. Mulchay, 902 F.2d

524, 539 (7th Cir. 1990).  As the Supreme Court has stated:

> The requirement of discriminatory intent or purpose  "... implies that the
> decision maker, . . . Selected or reaffirmed a particular course of action at
> least in part 'because,' not merely 'in spite of' its adverse effects . . . upon a
> member of a protected group."

Personnel Administrator of Massachusetts v. Feeney, 442 U.S. 256, 279, 99 S. Ct.

2282, 2296, 60 L.Ed.2d 870 (1979).

Additionally, as part of his burden of proof to establish a Section 1983

violation of his constitutional right to equal protection, the plaintiff must also

prove that the **defendants** "caused" the deprivation of his rights.  Taylor v.

Brentwood Union Free School District, el al., 143 F.3d 679 (2d Cir 1998), citing

Martinez v. California, 444 U.S. 277, 285, 100 S. Ct. 553, 62 L.Ed.2d 481(1980).

In the present case, the plaintiff cannot show that the two defendants in

this case that Ohene identifies, Michael Wood and Dorothea Hamilton,

intentionally violated his constitutional rights by treating him differently than similarly treated employees BECAUSE of his race, gender or ethnic origin. The plaintiff admits that he never undertook any investigation into the caseloads or work performance of other social workers. (Facts, ¶ 33). He admits to knowing at least one white social worker who received an unsatisfactory performance rating. (Facts, ¶ 47). Therefore, who exactly are the similarly situated white female social workers to whom the plaintiff compares himself? It is not sufficient for the plaintiff to merely rely on conclusory allegations. He must actually show similarly situated employees who were treated differently than him because of his race or gender.

Ohene admits that, while he was in the Bridgeport office, all of the social workers in his unit were criticized for work deficiencies "across the board." (Facts, ¶¶ 46-67). Furthermore, according to Ohene, defendant Hamilton only directly supervised him for two weeks. (Facts, ¶ 27). It is correct that Ohene was dismissed in 2000 by the agency, but he does not attribute that decision to Hamilton. He was subsequently reinstated with back pay and reassigned to a different office. The plaintiff simply has no evidence that Dorothea Hamilton violated his right to equal protection. Ohene does not allege that Ms. Hamilton took any specific action against him as compared to white or female social workers.

The case against Michael Wood, himself a black male, is even more tenuous. Mr. Wood had no supervisory authority over Ohene. (Facts, ¶¶ 3, 42). He never disciplined Ohene or any social worker. His sole responsibility was to review grievances internally as part of the process and present the agency position before the State Office of Labor Relations. (Facts, ¶ 42). More importantly, Mr. Wood's responsibility for the Southwest region ended in 1998. (Facts, ¶ 3). So any alleged act of discrimination that occurred after that time could not involve him.

Then there is the plaintiff's frivolous allegation that he was wrongfully denied a promotion, when in fact, he NEVER even applied for a promotion. It is axiomatic that as part of a prima facie case for the denial of a promotion a plaintiff must prove that there was a opening and he actually applied for the position. See, Brown v. Coach Stores, Inc., 163 F.3d 706, 709 (2d Cir. 1998)(a prima facie element requires that the victim have applied for a position for which he was qualified).

The plaintiff admits that he voluntarily resigned in 2001. (Facts, ¶ 39). Therefore, his only theory for a constitutional violation would be constructive discharge. However, an employee is not constructively discharged because he does not like his assignments, receives unfair criticism or is yelled at by supervisors. In Katz v. Beth Israel Medical Center, 2001 U.S. Dist. LEXIS 29 (S.D.

N.Y. 2001), the plaintiff claimed that she was constructively discharged because she was repeatedly threatened, berated and mocked by her supervisors, was yelled at and was criticized without basis. She also claimed that she was warned and disciplined for fabricated incidents that were not her fault and was given extra work with less assistance. In rejecting her claim, the District Court noted that such acts do not rise to the level of a constructive discharge. Essentially, the court recognized the principle that the law does not guarantee a pleasant or harmonious work environment. Id. at *42.

In sum, the plaintiff has no evidence that any of the individual defendants he identifies in his answers to interrogatories actually violated his constitutional rights.

### THE PLAINTIFF'S CLAIM AGAINST THE INDIVIDUAL DEFENDANTS FAILS FOR A LACK OF PERSONAL INVOLVEMENT.

In the present case, the defendants ask the court to pay particular attention to the personal involvement requirement under Section 1983 for two reasons. First, many of the plaintiff's allegations relate to alleged acts committed by individuals who are NOT NAMED DEFENDANTS in this lawsuit. Second, the personal involvement requirement directly contradicts any assertion by plaintiff's counsel that somehow liability for a "pattern and practice of discrimination under Title VII" can somehow be imputed to individual

defendants who have been sued personally. The latter question will be addressed more fully below.

In order to establish the individual liability of a defendant in his individual capacity under § 1983, the plaintiff is required to show the personal involvement of the defendant in the denial of equal protection. Gill v. Mooney, 824 F.2d 192, 196 (2d Cir. 1987); Estate of Walker v. City of Bridgeport, 676 F. Supp. 442, 446 (1986); Bapat v. Ct. Dept. Of Health Services, 815 F. Supp. 525 (D.Conn.1992). In order to establish personal involvement, the plaintiff is required to prove that the defendant (1) directly participated in the violation; (2) failed to remedy the violation after learning of it through a report or appeal; (3) created a custom or policy fostering violation or allowed the custom or policy to continue after learning of it; or (4) deliberate indifference to known constitutional violations. Provost v. City of Newburgh, 262 F.3d 146, 154-55 (2d Cir. 2001). A plaintiff must thus allege a tangible connection between the acts of the defendant and the injuries suffered. Bass v. Jackson, 790 F.2d 260, 263 (2d Cir.1986).

Consistent with the requirement that personal involvement is required for a claim under § 1983, the Supreme Court has ruled that the general doctrine of *respondeat superior* does not suffice to state a claim under § 1983. Monell v. New York City Dept. of Social Services, 436 U.S. 658, 692-95 (1978). An official cannot be held liable merely because he or she occupies a high position in the

government agency hierarchy.  Colon v. Coughlin, 58 F.3d 865, 874 (2d Cir. 1995).

It is well settled law that individual liability cannot be founded on official

position alone.  Horowitz v. Anker, 437 F. Supp. 495, 504 (E.D.N.Y. 1977), aff'd

mem. 578 F.2d 1368 (2d Cir. 1978); McKinnon v. Patterson, 568 F.2d 930, 934 (2d

Cir.), cert. denied, 434 U.S. 1087 (1977); Williams v. Vincent, 508 F.2d 541, 546 (2d

Cir. 1974).

   The plaintiff has no evidence that either defendants Wood or Hamilton

were personally involved in a violation of his constitutional rights. Wood had no

supervisory authority to take any action against the plaintiff. His sole

involvement was hearing grievances that the plaintiff filed. The plaintiff will not

be able to offer any evidence that defendant Wood was aware of any

discrimination against the plaintiff and failed to remedy it.  It is established law

that sporadic acts over several years are not sufficient to establish and policy or

custom. EEOC v. McDonnell Douglas Corp., 191 F.3d 948 (8th Cir. 1999)(pattern

and practice requires that employer "regularly and purposefully" treated

members of protected class less favorably and that unlawful discrimination was

the employer's "regular procedure and policy." Sporadic acts are insufficient.).

The plaintiff must prove that the defendant was aware of an illegal custom or

practice.  Gaston v. Couglin, 249 F.3d 156, 165-66 (2d Cir. 2001).

Similarly, defendant Hamilton was minimally involved with the plaintiff. She supervised Jacqueline Adams, who was one of the plaintiff's supervisors who noted problems with his work performance. But there is no evidence that Ms. Hamilton was aware of any policy or practice of discriminating against black males at DCF, which has been the plaintiff's implied theory of the case. Ms. Hamilton has testified by affidavit that she first arrived in the DCF Bridgeport office in 1998. She states that throughout her experience she has counseled and disciplined numerous white and black social workers, both male and female. She denies any practice of singling out black male social workers for more frequent discipline. Certainly in the present case, the repeated work related problems Ohene exhibited to several different supervisors, in different units and in different DCF offices, cannot be imputed to Dorothea Hamilton personally.

Then there is the issue of the raw statistics showing that during the <u>4.5</u> year period between 1996 and June 2000, there were 27 incidents of discipline involving a social worker in the Bridgeport office, 22 of which involved a black male. We know that during this same period Mr. Ohene received 3 warnings (one each in 1997, 1998 and 1999) and was dismissed in 2000, which was later reversed. (Facts, ¶¶ 3-47). So of the 22 incidents involving black males, 4 or more involved the <u>same</u> person, Benjamin Ohene.

While the plaintiff will characterize this number as a gross disparity, there is no evidence about in what years these disciplinary actions occurred throughout the 4.5 year period.  He cannot show how many incidents involved Ms. Hamilton. The warnings he received occurred a year a part and by different supervisors in different units. (Facts, ¶¶ 6-32).  The sporadic incidents by different actors makes any statistical inference suspect, much less shows that Hamilton was aware of an unconstitutional policy or practice that posed a risk of harm to the plaintiff.  Defendant Hamilton reminds the court that she did not arrive in the Bridgeport office until <u>1998</u>, thus making any inference about acts that occurred before that date immaterial.  (Facts, ¶ 5).

The problem with the raw statistical numbers in this case is that they provide no context for a valid statistical inference of discrimination, much less establish an unconstitutional policy or custom.  The raw numbers alone don't tell us:  In what units did the incidents occur? In what years? Who was the supervisor? What were the circumstances of each occurrence?  What were the comparative skill level of white women v. black males? How many instances involved the same person?  Did Bridgeport have an unusually high group of poor functioning employees?   The raw numbers alone, without a expert analysis, cannot suffice to begin to show that Dorothea Hamilton or Michael Wood violated the plaintiff's rights.

In Foster v. Tandy Corporation, 828 F.2d 1052 (4th Cir. 1984), the court rejected raw numbers that lacked a sufficient context upon which to base a valid statistical inference of discrimination. In doing so, the court reiterated the rule that raw statistics devoid of any context which relates those statistics to the alleged discriminatory practice are of minimal probative value." Id. at 1057.

The same defect applies to Kristine Ragaglia, who is named as a nominal defendant. There is no evidence of a systemic pattern or practice of discrimination that Ms. Ragaglia was aware of and failed to correct. Ohene has no evidence that Ragaglia knew of him or was personally involved with the employment decisions effecting his job that would give rise to personal liability. The defendants remind the court that the burden rests with the plaintiff to offer, through expert testimony, a valid statistical inference that has eliminated legitimate nondiscriminatory reasons for any statistical disparity.[3]

---

[3] It is established law in this circuit that statistical evidence in a disparate treatment case is generally admissible if the requisite foundation is established. Hollander v. American Cyanamid Co., 172 F. 3d 192, 202 (2d Cir. 1999). However, before such statistical evidence is admissible the offering party must establish the reliability of any inferences to be drawn from the statistical evidence. Id. at 203.

In the Hollander case, the plaintiff brought an age discrimination claim for wrongful termination. In support of his case, the plaintiff sought to offer the statistical reports of an expert who had analyzed the terminations at the defendant's plant and was prepared to opine within a high degree of statistical certainty that age was a determining factor in the plaintiff's termination. Finding the expert's opinion based on raw statistics to be unreliable, the trial court excluded the experts' testimony. On appeal, the Second Circuit Court of Appeals affirmed the trial court ruling. Acknowledging the unreliability of raw statistics, the Court of Appeals stated the following:

Even if the plaintiff could somehow manipulate the raw statistics into a prima facie case, the defendants' conduct was based on legitimate nondiscriminatory conduct by the plaintiff.  The same substantive core principles that underlie Title VII also apply to a § 1983 action premised upon a violation of the equal protection clause.  Patterson v. County of Oneida, 375 F.3d 206, 225 (2d Cir.  The plaintiff received letters of warning between 1997 and 2001 for repeated work deficiencies and inappropriate conduct.  He voluntarily resigned in 2001.  Neither defendants Wood, Ragaglia nor Hamilton had any direct involvement in Ohene's termination in 2000[4]  because of a continued documented history of poor work performance. He was later reinstated and executed a release of liability.  (Facts, ¶¶ 30-31). There is simply no evidence that any defendant was motivated by the plaintiff's race or gender.

---

However, the Report's inference of discrimination **solely on the basis of the raw numbers is impermissible in the absence of any attempt to account for other causes of the . . . anomaly.** . . .  Highlighting Gaudard's failure to account for explanations other than discrimination is the fact that both 60-69 and 70-79 level 9+ workforce increased moderately over the course of those years.  In short, data presented by Gaudard's in this part of the report does not make it any more or less likely that Cyanamid is liable for age discrimination.  (Emphasis added).

Id. at 203.

See also, Delgado v. Achieve Global, 2000 Conn. Super LEXIS 3184 (November 15, 2000, Melville J).

[4]  The plaintiff was terminated in 2000 for poor work performance and inappropriate conduct. He was reinstated with full back pay in 2001 per a stipulated "Last Chance Agreement". (Facts, ¶¶ 30-31).

In sum, there is insufficient evidence to show that the potentially sporadic events of discipline involving the plaintiff over several years was part of an intentional practice of disciplining black male social workers sufficient to support any <u>personal</u> liability by the individual defendants whose contact with Ohene was minimal. The plaintiff must show that the legitimate nondiscriminatory reason for the discipline that Ohene received was a pretext for intentional discrimination. There is simply no evidence of pretext and the plaintiff statistical evidence is insufficient as a matter of law.

### THE PLAINTIFF'S SECTION 1981 CLAIM FAILS BECAUSE SECTION 1983 IS THE EXCLUSIVE FEDERAL REMEDY FOR THE ALLEDGED VIOLATION OF HIS CONSTITUTIONAL RIGHTS.

Section 1981 provides, in relevant part,

> All persons within the jurisdiction of the United States shall have the same right ... To make and enforce contracts, ... And to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by **white citizens** ...

42 U.S.C. § 1981 (emphasis added).

The plaintiff has sued the defendants in their individual capacities for a violation of his rights guaranteed by Section 1981. However, since the plaintiff's claims involve a "state actor," the District Court must conclude that the plaintiff's exclusive remedy lies in his action under 42 U.S.C. § 1983. The rule of law was first set out by the Supreme Court in the case of <u>Jett v. Dallas Independent School District</u>, 491 U.S. 701, 109 S. Ct. 2702, 105 L.Ed.2d 598 (1989).

In <u>Jett</u>, the Supreme Court examined the relationship between Section § 1983 and

§ 1981.  Concluding that in enacting Section 1983 Congress intended that it was

enacting the exclusive remedy against state actors for the violation of

constitutional rights, the Court stated:

> The historical evidence surrounding the revisions of 1874 further indicates
> that Congress thought that the declaration of rights in § 1981 would be
> enforced against state actors through the remedial provisions of § 1983.

<u>Id</u>. at 733-34.

As the district court noted in its opinion in 1991, Congress amended

section 1981 to include a provision that reads:  "The rights protected by this

section are protected against impairment by nongovernmental discrimination

and impairment under color of State law." 42 U.S.C. § 1981(c). Subsequently,

plaintiffs have argued unsuccessfully to other Circuit Courts that the amendment

to § 1981 overruled <u>Jett</u>.   However, the Fourth, Fifth, Eighth and Eleventh

Circuits have concluded that the amendment to section 1981 did not change the

rule set forth in the <u>Jett</u> case.  After examining the legislative history of the

amendment, these circuits concluded that the purpose of the amendment was to

clarify that Section 1981 applies to nongovernmental entities, not to reverse or

alter the holding in <u>Jett</u>.  <u>See</u>, <u>Oden v. Oktibbeha County</u>, 246 F.3d 458 (5th Cir.

2001); <u>Butts v. County of Volusia</u>, 222 F.3d 891, 894 (11th Cir. 2000); <u>Dennis v.</u>

<u>County of Fairfax</u>, 55 F.3d 151, 156 n. 1 (4th Cir. 1995);  <u>Cerrato v. San Francisco</u>

Community College Dist., 26 F.3d 968 (9th Cir. 1994); Williams v. Little Rock

Mun. Water Works, 21 F.3d 218 (8th Cir. 1994).

   In Felton v. Polles, 315 F.3d 470 (5th Cir. 2002), the Fifth Circuit

determined that the rule set out by the Supreme Court in Jett equally applies to

state officials sued in their individual capacity. In so holding, the Fifth Circuit

reasoned that the Supreme Court did not make a distinction between state

entities and individuals acting pursuant to color of state law.  Following the

sound reasoning of the court in Felton, the district court concluded that the

plaintiff could not maintain a § 1981 action.

### PLAINTIFF'S § 1981 CLAIM FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

   Even if this court were to find that the plaintiff has standing to sue under

§ 1981, there is yet an additional basis to reject the plaintiff's § 1981 claim, namely

his claim fails to state a claim upon which relief can be granted.  To state a claim

under § 1981, a plaintiff must allege and prove: (1) [that he] is a member of a

racial minority; (2) an intent to discriminate on the basis of race by the defendant;

and (3) [that] the discrimination concerned one or more of the activities

enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give

evidence, etc.). Mian v. Donaldson, Lufkin & Jenrette Sec., Corp., 7 F.3d 1085,

1087 (2d Cir. 1993).  A section 1981 action must allege "that the defendants' act

were purposefully discriminatory ... and racially motivated." Albert v. Carovano,

851 F.2d 561, 571-72 (2d Cir. 1988) (en banc)(citations omitted).  As discussed in this brief, the plaintiff can put forth no evidence that defendants Ragaglia, Wood or Hamilton acted towards him in a discriminatory manner because of his race. Abramowitz v. Inta-Boro Acres, Inc., 1999 U.S. Dist. LEXIS 2005  (E.D.N.Y. 1999).

In this Circuit, complaints relying on civil rights statutes are insufficient if they merely include a "litany of general conclusions ..." Hall v. Dworkin, 829 F. Supp. 1403, 1412 (N.D.N.Y. 1993)(citing Barr v. Abrams, 810 F.2d 358, 362 (2d Cir. 1987). Cf. Martin v. N.Y. State Dep't of Mental Hygiene, 588 F.2d 371, 372 (2d Cir. 1978)("a complaint consisting of nothing more than naked assertions fails to state a claim").  Instead, "on a claim under § 1981, a plaintiff must show both that he was subjected to intentional discrimination, and that this discrimination interfered with a contractual relationship." Krulik v. Board of Educ. of City of New York, 781 F. 2d 15, 23 (2d Cir. 1986)(internal citations omitted).

In the present case, the only act that interfered with the plaintiff's employment was his dismissal in 2000 and subsequent reinstatement with full back pay.  There is simply no evidence that defendants Hamilton, Wood or Ragaglia were the decision makers involved in Ohene's dismissal.  Ohene does not attribute the decision to dismiss him in 2000 to either Wood or Hamilton. (Facts , ¶ 30).

**THERE IS NO LEGAL BASIS FOR IMPUTING LIABILITY AMONG ALL THE DEFENDANTS IN THEIR PERSONAL CAPACITY.**

The defendants note that in Count 33 of the Third Amended Complaint "all of the plaintiffs" alleges that "all of the defendants created a chilling effect across the agency work environment against black males." (Third Amended Complaint, Count 33). Assuming that such a vague pleading can state a cause of action against the individual defendants, such a claim fails for several reasons.

It is hard to understand precisely the legal basis for an aggregate claim against all of the defendants in their <u>personal capacities</u>. The complaint lists 20 plus defendants from all over the state of Connecticut. According to this plaintiff, only <u>two</u> defendants actually committed any alleged wrongful acts against him. How then, can alleged acts that occurred in different regions of the state by different actors be imputed to these two defendants?

Plaintiff's counsel will respond by asserting that there was a pattern and practice of DCF to discipline black males more frequently than white females. But even if the plaintiff could prove a pattern of disparate treatment of black males, how can that be imputed to the individual defendants, in their personal capacities, absent direct evidence that each defendant was <u>aware</u> of an unlawful practice. The statistical evidence shows that DCF has 21 offices throughout the different regions and employs thousands of employees. In the Bridgeport region

alone, the agency has over 3,400 employees, of which 646 were managers. (Facts, ¶ 76; Ex. 4, Paton Aff., Ex. A, p. 10).  Therefore, it is impossible to say, absent some actual evidence by the plaintiff, that Dorothea Hamilton or Michael Wood "knew" or should have known about facts giving rise to a constitutional violation by subordinates or of an actual DCF policy of disciplining black male social workers.  In Provost v. City of Newburgh, 262 F.3d 146 (2d Cir. 2001), the Second Circuit ruled that "direct participation" is the basis for supervisory liability that requires intentional participation in the conduct constituting a violation of the plaintiff's rights by a person who knew or should have known of facts comprising the illegal conduct. Id. at 155.

In order for there to be supervisory liability, the plaintiff must prove that each defendant directly participated in the constitutional violation, failed to remedy a constitutional wrong after learning of it, that a supervisor created a policy or custom under which constitutional practices occurred or allowed the continuance of a policy or custom, or the supervisor's deliberate indifference by failing to act on information indicating that unconstitutional acts were occurring. See Moffitt v. Town of Brookfield, 950 F.2d 880, 886 n.5 (2d Cir. 1991).

In the present case the plaintiff seeks to make a metaphysical leap from the disciplining of DCF employees across the agency to personal liability for the individual defendants premised upon an alleged agency wide statistical

disparity based solely on raw numbers.  Ms. Hamilton denies any such

knowledge and testifies that Mr. Ohene had a long history of work related

difficulties.  Defendant Wood had limited contact with the plaintiff and

absolutely no supervisory authority.

Then there is the legitimate nondiscriminatory reason for the disciplining

of Ohene borne out through the observations of several different supervisors

from different units and in different offices within the Southwest region. More

disturbing is the fact that the plaintiff has done no discovery in this case.  He has

no evidence upon which to impute knowledge of any alleged unconstitutional

acts to defendants Hamilton or Wood.  Neither defendant was deposed. This

begs the question how will the plaintiff show that any individual defendant from

any region was aware of facts giving rise to a constitutional violation.  So for

example, the plaintiff admits that Hamilton supervised him for two only weeks.

It is also true that Jacqueline Adams was a subordinate of Ms. Hamilton, but

there is absolutely no evidence that Hamilton was aware of facts showing a

constitutional violation of any type.   How can the alleged acts of supervisors in

the New Haven, Norwich, Middletown and other DCF offices be imputed to Mr.

Wood and Ms. Hamilton? The answer is, they cannot.  More appropriately, the

plaintiff should have filed a charge of discrimination against DCF under Title VII

if he wanted to advance such a theory. He did not, and now wants to impute the

conduct of hundreds of independent and unrelated acts, by different actors, to these individual defendants. It's a legal theory that is being misapplied.

### THE DEFENDANTS ARE ENTITLED TO JUDGMENT IN THEIR FAVOR ON PLAINTIFF'S STATE LAW CLAIM OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

It is well settled that, in order to state a claim of intentional infliction of emotional distress, "[i]t must be shown: (1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress and (4) that the emotional distress sustained by the plaintiff was severe." Petyan v. Ellis, 200 Conn. 243, 253-54 (1986). "Liability for intentional infliction of emotional distress has been found only where conduct exceeds all bounds usually tolerated by decent society and is so outrageous in character, so extreme in degree, and is calculated to cause, and does cause, mental distress of a very serious kind." DeLaurentis v. New Haven, 220 Conn. 225, 267 (1991). "The issue of whether a defendant's conduct is extreme and outrageous is a question to be determined by the court in the first instance." Only where reasonable minds can differ does the question become an issue fort he jury to decide. Petyan v. Ellis, 200 Conn. at 243.

In the recent case of <u>Majewski v. Bridgeport Board of Education</u>, 11 Conn. Ops. 230 (February 2005), the plaintiff alleged that she was harassed at work and suffered emotional distress.  The type of acts she complained of included such things as being hugged and kissed, being questioned about her sexual orientation, being removed as the "teacher in charge" which forced her to resign as a union representative,  and being called a "pompous arrogant bitch."  The defendant moved to dismiss the claim of intentional infliction of emotional distress. The court agreed, finding that the alleged acts did not meet the standard to prove intentional infliction of emotional distress.

In the present case, there were no acts by any of the individual defendants that could remotely rise the level required by Connecticut law.  The law does not shield an employee from discipline for work related deficiencies. There are no allegations that Michael Wood did anything egregious towards the plaintiff. The allegations that defendant Hamilton disciplined the plaintiff for work related issues does not constitute the tortuous infliction of emotional distress.

## **<u>CONCLUSION</u>**

For all of the above reasons, the defendants motion for summary judgment should be granted in its entirety.

DEFENDANTS,

RICHARD BLUMENTHAL
ATTORNEY GENERAL


BY: _____

Joseph A. Jordano
Assistant Attorney General
Federal Bar # ct21487
55 Elm Street, P.O. Box 120
Hartford, CT 06141-0120
Tel: 860-808-5340
Fax: 860-808-5383
email: Joseph.Jordano@po.state.ct.us


## **CERTIFICATION**

The undersigned hereby certifies that on the  16th    day of  March, 2005, a true

and accurate copy of the foregoing was sent by United States mail, first class postage

prepaid, to the following:

Francis A. Miniter, Esq.
Miniter & Associates
100 Wells Street, Suite 1-D
Hartford, CT  06103



_____

Joseph A. Jordano
Assistant Attorney General

26