IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
-------------------------------------------------------x
                                           :
RYAN WILLIAMS ET AL.                       :        3:01 CV 1398 (JGM)
                                           :
v.                                         :
                                           :
                                           :
KRISTINE RAGAGLIA ET AL.                   :
                                           :        DATE: FEBRUARY 26, 2007
-------------------------------------------------------x
```

<u>RULING ON DEFENDANTS' MOTION FOR [PARTIAL] SUMMARY JUDGMENT</u>

On July 25, 2001, plaintiffs commenced this action (Dkt. #1), followed by an Amended Complaint on December 11, 2001 (Dkt. #31), a Second Amended Complaint on June 12, 2002 (Dkt. #40), and a Third Amended Complaint on December 18, 2002 (Dkt. #57). The Third Amended Complaint in which each of the seven plaintiffs, who were former employees of the Connecticut Department of Children and Families ["DCF"], includes twenty-three counts, alleging violations of the Fourteenth Amendment and 42 U.S.C. § 1983, 42 U.S.C. § 1981, and intentional infliction of emotional distress against his or her various supervisors. At this point, only four plaintiffs remain in the litigation – plaintiff Williams (Counts One to Three), plaintiff Johnson (Counts Four to Six), plaintiff Hood (Counts Fourteen to Sixteen), and plaintiff Whilby (Counts Twenty to Twenty-five)[1]; Count Thirty-Three was brought under 42 U.S.C. § 1983 by all plaintiffs against all individual defendants.[2]

――――――――――――――――――

[1]The additional counts (Counts Twenty-three through Twenty-five) are for wrongful discharge, and Title VII and CONN. GEN. STAT. § 46a-60(a)(1) claims against defendant DCF.

[2]Defendants' Motion for Default Judgment was granted as to plaintiff Darko (Counts Seven to Nine) on June 10, 2003 (Dkts. ##68-69), defendants' Motion for Summary Judgment was granted as to plaintiff Cohen (Counts Ten to Thirteen) on January 25, 2006 (Dkt. #106), defendants' Motion for Summary Judgment was granted as to plaintiff Williamson (Counts Seventeen to Nineteen) on August 21, 2006 (Dkt. #130), defendants' Motion for Default Judgment was granted as to plaintiff Ovide (Counts Twenty-six to Twenty-nine) on June 10, 2003 (Dkts. ##68-69), and defendants' Motion for Summary Judgment was granted as to plaintiff Ohene

The defendants named in Counts Fourteen to Sixteen are Ada Sanchez (a DCF Social Work Supervisor), James Moore (a DCF Supervisor), Rudolph Brooks (a DCF Program Director), Linda Harris (a DCF Program Director), Tara Lewis (a DCF Program Supervisor), Leticia Lacomba (a DCF Regional Administrator), and Kristine Ragaglia (former DCF Commissioner). (Third Amended Complaint, ¶¶ 4.A, 4.I, 4.K, 4.L, 4.M, 4.N, 4.O, 491, 523, 550).

On March 3, 2003, the parties consented to trial before this Magistrate Judge. (Dkt. #65). On June 24, 2005, this Court granted summary judgment, absent objection, as to plaintiff Ohene's claims(Dkt. #98)["June 2005 Ruling"]; summary judgment was also granted, absent objection, on January 25, 2006, as to plaintiff Cohen's claims (Dkt. #105) ["January 2006 Ruling"](see also Dkts. ## 107-12). Familiarity is presumed with both these rulings. Thereafter, on August 21, 2006, this Court granted defendants' Motion for Summary Judgment as to plaintiff Williamson, "on consent, in light of plaintiff Williamson's failure to cooperate with her attorney in opposing this motion." (Dkt. #130).

On January 31, 2007, defendants filed the pending Motion for [Partial] Summary Judgment as to plaintiff Alice Hood with brief, index of exhibits and Local Rule 56(a)1 Statement of Material Facts in support. (Dkts. ##139-42[3]; see also Dkts. ##131, 133-38).

---

(Counts Thirty to Thirty-two) on June 24, 2005 (Dkt. #98).

[3]The index of exhibits in support of defendants' Motion (Dkt. #142) includes the following eight exhibits: copy of excerpts from deposition testimony of Alice Hood, taken on June 23, 2003 ["Hood Depo."](Exh. 1); copy of letter confirming offer of employment to Hood, dated July 2, 1993 ["July 2, 1993 Letter"](Exh. 2); copy of correspondence from Department of Administrative Services Bureau of Human Resources, dated March 13, 1995 ["March 13, 1995 Letter"](Exh. 3); copy of job posting for Social Work Supervisor, with closing date of February 24, 1995 ["Job Announcement"](Exh. 4): copy of letter, dated March 30, 1995 ["March 30, 1995 Letter"](Exh. 5); affidavit of Tara Lewis, sworn to on January 12, 2007 ["Lewis Aff't"](Exh. 6); copy of affidavit of Linda Harris, sworn to on January 18, 2007 ["Harris Aff't"], with a Performance Appraisal attached ["Performance Appraisal"](Exh. 7); and copy of Defendant[s'] First Set of Interrogatories and

Plaintiff Hood has failed to file a timely brief in opposition.

For the reasons stated below, defendants' Motion for Summary Judgment (Dkt. #139) is **granted, absent objection.**

## I. DISCUSSION

The standard for summary judgment is well established.  The moving party is entitled to summary judgment if it demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  Upon motion, following adequate time for discovery, Rule 56(c) requires that summary judgment be entered against a party

> who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

This showing may be made by "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any."  FED. R. CIV. P. 56(c).  "On summary judgment the inferences to be drawn from the underlying facts contained in the [the moving party's] materials must be viewed in the light most favorable to the party opposing the motion."  Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970), quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).  "If reasonable minds could differ as to the import of the evidence, . . . the moving party simply cannot obtain summary judgment."  R.B.

---

Request for Production to Plaintiffs, dated July 26, 2002 ["Interrogatory Responses"](Exh. 8).

Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997)(citations & internal quotation marks omitted).  Thus, the party moving for summary judgment must "carry its burden of showing the absence of any genuine issue of fact."  Adickes, 398 U.S. at 153.

As stated above, plaintiff Hood has failed to file a timely brief in opposition to defendants' Motion for Summary Judgment or a Local Rule 56(a)2 Statement.  Federal Rule of Civil Procedure 56 provides that if a non-moving party fails to oppose a summary judgment motion, then "summary judgment, if appropriate, shall be entered against" her. FED. R. CIV. P. 56(e)(emphasis added).   As this Court observed in its June 2005 Ruling, and again in its January 2006 Ruling, the Second Circuit has made clear that when a nonmoving party "chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial." Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004)(citation omitted). If the moving party's evidence does not satisfy the burden of production, "then summary judgment must be denied even if no opposition evidentiary matter is presented."  Id. (internal quotations, citation & emphasis omitted).

If a non-moving party fails to file a counter statement, the facts in the moving party's Local Rule Statement are deemed admitted.  See D. CONN. L. CIV. R. 56(a)1("All material facts set forth in said statement will be deemed admitted unless controverted by the statement required to be served by the opposing party in accordance with Rule 56(a)2."); see also Booze v. Shawmut Bank, Conn., 62 F. Supp. 2d 593, 595 (D. Conn. 1999)(discussing statements of fact required by motions for summary judgment sought pursuant to former

Local Rule 9(c)(1) and 9(c)(2)).  The Second Circuit requires, however, that there be support in the record for the unopposed Rule 56(a) statements before such statements may be accepted as true.  See Giannullo v. City of New York, 322 F.3d 139, 140, 143, n.5 (2d Cir. 2003); see also Vermont Teddy Bear, 373 F.3d at 244.  Thus, an "unopposed summary judgment motion may also fail where the undisputed facts fail to show that the moving party is entitled to judgment as a matter of law."  Vermont Teddy Bear, 373 F.3d at 244 (internal quotations & multiple citations omitted).  The district court "must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law."  Id. at 246 (citations & internal quotations omitted).

     A. FACTUAL BACKGROUND

Because plaintiff has failed to file a Rule 56(a)2 counter statement to defendants' Rule 56(a)1 Statement of Facts, the following factual summary is drawn from defendants' Local Rule 56(a)1 Statement of Facts, filed January 31, 2007 (Dkt. #141)["Defendants' Statement"], and the accompanying affidavits, excerpts of deposition testimony and exhibits.  (See Dkt. #142).  See Giannullo, 322 F.3d at 140, 143, n.5.  Such factual summary, therefore, does not represent factual findings of the Court.

DCF hired plaintiff[4] as a social worker in 1993, and the next year, plaintiff was assigned to the DCF Region 4 Investigations Unit in Hartford. (Defendants' Statement ¶¶ 2-3; July 2, 1993 Letter; Hood Depo. at 6, 8). From 1994 through 1996, plaintiff's supervisor was defendant Ada Sanchez.  (Defendants' Statement ¶ 4; Hood Depo. at 8-9).

According to plaintiff, in March 1995, she was denied an opportunity to take a test to

---

[4]Plaintiff is an African American female.  (Third Amended Complaint, ¶ 3.C).

be a DCF supervisor, at which time Philip Obregón, a Personnel Officer at DCF, informed her that she was not eligible for the examination.  (Defendants' Statement ¶ 17; Hood Depo. at 11; see July 2, 1993 Letter).   The job announcement for the Social Worker Supervisor examination noted that candidates required a combination of college training and experience totaling seven years, and that current state employees, as of January 7, 1991, could qualify for the Social Worker Supervisor examination without an M.S.W. or M.C.W. degree. (Defendants' Statement ¶¶ 21-22; Job Announcement).  Plaintiff was notified by letter, dated March 13, 1995, from the Department of Administrative Services ["DAS"], that she could not sit for the Social Worker Supervisor examination because she did not possess the minimum experience and training required for admittance to the examination.  (Defendants' Statement ¶¶ 18, 20; March 13, 1995 Letter).  Plaintiff testified that none of her supervisors, and none of the named defendants, denied her the opportunity to take the test to be a DCF supervisor, and plaintiff did not file a complaint with the Connecticut Commission on Human Rights and Opportunities regarding her not taking the supervisor exam in 1995.  (Defendants' Statement ¶¶ 19, 24; Hood Depo. at 11-12).  On March 30, 1995, plaintiff appealed her denial of entrance to the Social Worker Supervisor examination by forwarding a letter to Nicholas Visone at DAS.  (Defendants' Statement ¶ 23; March 30, 1995 Letter).

In April 1995, plaintiff suffered a work-related injury, causing her to be out of work for more than a week.  (Defendants' Statement ¶ 5; Hood Depo. at 12).   At that time, plaintiff applied for and received Workers' Compensation benefits.  (Defendants' Statement ¶ 5; Hood Depo. at 12-13).  Six months later, in October 1995, plaintiff suffered a second work-related injury and was out of work for approximately six months, during which time plaintiff received Workers' Compensation benefits.  (Defendants' Statement ¶¶ 6-7; Hood

6

Depo. at 13-14).   Plaintiff alleges that in 1995, defendant Sanchez spread rumors that plaintiff was not really hurt.  (Defendants' Statement ¶ 13; Hood Depo. at 34-35).   Plaintiff admitted that she did not think that the comments made by Sanchez were racially motivated, but  rather, defendant Sanchez was expressing her opinion to people who did not get along with plaintiff.  (Defendants' Statement ¶ 14; Hood Depo. at 35).   Plaintiff also testified that around this time, defendant Sanchez and Valerie Miles, a supervisor in plaintiff's unit who would replace defendant Sanchez in Sanchez's absence, allegedly denied plaintiff time off to see a doctor; however, plaintiff did not file a complaint with DCF regarding this alleged denial of time off.  (Defendants' Statement ¶¶ 15-16; Hood Depo. at 38-39).

In 1996, plaintiff returned to work after having been released by her doctor, and on one occasion, Charles Frazier, an African-American Program Supervisor, told her that she would be fired if she was unable to perform the duties of her job, which included being able to lift a child.   (Defendants' Statement ¶¶ 25-27, 29; Hood Depo. at 15-18).   After this incident with Frazier, which arose when plaintiff was not able to lift a child to whom she was assigned, Frazier offered to move plaintiff to a specialty unit working with newborns, rather than sexual abuse and serious injury matters, in which unit Judy Levy would have been her supervisor.  (Defendants' Statement ¶¶  27, 31; Hood Depo. at 16-17, 29-30).[5]   Plaintiff declined the offer.  (Defendants' Statement ¶ 32; Hood Depo. at 29-30).  Plaintiff did not request an accommodation regarding the requirement that she be able to lift a child as part of her job duties.   (Defendants' Statement ¶ 33; Hood Depo. at 16-17).

For six months, in 1996 to 1997, plaintiff was supervised by defendant Social Worker

---

[5]Frazier is not named as a defendant in this action.  (Defendants' Statement ¶ 28; Third Amended Complaint, ¶ 4).

Supervisor James Moore in a specialty unit that focused on sexually abused children. (Defendants' Statement ¶ 8; Hood Depo. at 8-9, 24). This specialty unit has "five" social workers; according to Hood, "[t]hree were white, two were African-American and one was Hispanic."[6] (Defendants' Statement ¶ 35; Hood Depo. at 20). According to plaintiff, defendant Moore did not hold conferences with plaintiff as he was required to prior to a case assignment and prior to a case being closed out. (Defendants' Statement ¶ 34; Hood Depo. at 19). Plaintiff testified that she assumed, but did not know, if defendant Moore met "regularly" with the others in his unit. (Defendants' Statement ¶¶ 36-37; Hood Depo. at 20-21). Plaintiff did not file a complaint regarding defendant Moore's alleged failure to meet with her, and plaintiff testified that other than not meeting with her, defendant Moore took no adverse employment action against her. (Defendants' Statement ¶¶ 38-41; Hood Depo. at 21-23).[7]

From approximately 1997 to 1999, plaintiff was supervised by Social Worker Supervisor Charles Wiggins in a regular investigations unit (Defendants' Statement ¶ 9; Hood Depo. at 8-9), and from 1999 to 2000, plaintiff was supervised by Social Worker Supervisor Duckworth Grange. (Defendants' Statement ¶ 10; Hood Depo. at 8-9). From 2000 to sometime in 2001, plaintiff was supervised by defendant Social Worker Supervisor Tara Lewis, an African-American female. (Defendants' Statement ¶¶ 11, 45; Hood Depo. at 8-9, 18-19, 41; see Lewis Aff't ¶¶ 3 & 6). Defendant Lewis has been with DCF since 1989 and has held this supervisor position since 2001. (Defendants' Statement ¶ 45; Lewis Aff't ¶¶ 4-5).

---

[6]Although this adds up to six social workers, plaintiff testified that there were five social workers - three whites, two blacks and one Hispanic. (Hood Depo. at 20).

[7]Later, it was Charles Frazier, who is not a named defendant in this case, who reassigned plaintiff from defendant Moore's unit to one supervised by Charles Wiggins, an African-American male. (Defendants' Statement ¶ 42; Hood Depo. at 23-24).

Plaintiff, due to medical reasons, was in and out of defendant Lewis' unit for extended periods of time and because of this, defendant Lewis never completed a performance appraisal for plaintiff.  (Defendants' Statement ¶ 48; Lewis Aff't ¶ 7).

Plaintiff alleges that on ten or so occasions in the spring of 1999, she was subjected to sexual touching by defendant Lewis.  (Defendants' Statement ¶¶ 43-44; Hood Depo. at 41-42).[8]   Defendant Lewis avers that she never touched plaintiff inappropriately, that plaintiff's allegation is "flatly false," that plaintiff never told her that she touched her inappropriately, that she never took an adverse employment action against plaintiff, and that she never treated plaintiff differently than any other member of her unit.  (Defendants' Statement ¶¶ 49-51; Lewis Aff't ¶¶ 8-12).  According to defendant Lewis, if anything, she treated plaintiff with more understanding than others based upon plaintiff's medical circumstances and did not assign plaintiff to cases that would take a lot of overtime unless she consulted with her based on her medical condition. (Defendants' Statement ¶ 50; Lewis Aff't ¶ 12).  Plaintiff testified that she did not notify DCF management regarding any inappropriate action by defendant Lewis and that DCF management may not have known anything about any alleged inappropriate touching since plaintiff only told her co-workers. (Defendants' Statement ¶¶ 52, 57; Hood Depo. at 41-42).

Defendant Lewis also avers that plaintiff's complaint that defendant Lewis ordered her to leave the work in January 2000 is a "half truth."  (Defendants' Statement ¶ 53; Lewis Aff't ¶ 13).  Hood testified that she went out on medical leave after suffering chest pains in the workplace and attempted to return to work without medical authorization, which defendant Lewis' Program Supervisor Linda Harris told Lewis was a requirement for plaintiff to return

---

[8]See note 14 infra.

to work.  (Defendants' Statement ¶¶ 54-55; Hood Depo. at 44-45; Lewis Aff't ¶ 13).  Plaintiff is not aware of any white employees who were treated differently regarding the DCF policy requiring a medical certificate to return to work.  (Defendants' Statement ¶ 56; Hood Depo. at 47).[9]  Additionally, although plaintiff complained that her work was unduly scrutinized by defendant Lewis, she admitted that she is unaware if other people's work was similarly scrutinized.  (Defendants' Statement ¶ 58; Hood Depo. at 48-49).

Defendant Linda Harris is an African-American female who was the Program Supervisor during the time period that plaintiff worked in the Region 4 Hartford Office from 1994-2001.[10]  (Defendants' Statement ¶¶ 59, 62; Harris Aff't ¶¶ 2, 6).  Prior to her transfer to the probate unit under defendant Harris, plaintiff was supervised by Social Worker Supervisor Donyale Pina from sometime in 2001 to October 2001 in the investigations unit. (Defendants' Statement ¶¶ 12, 63; Hood Depo. at 9; Harris Aff't ¶ 7; Performance Appraisal).

Plaintiff's work performance, based in part on work-related injuries, was not up to the level required in the investigations unit.  (Defendants' Statement ¶ 64; Harris Aff't ¶ 8).  She was not performing her duties in a timely manner and her documentation of case-related activities was not complete and not timely.  (Id.; Performance Appraisal). Plaintiff was informed verbally by defendant Harris that she was being transferred to the probate unit

---

[9]Plaintiff conceded that she did not believe that defendant Lewis' action were "because of [plaintiff's] race," but "because of just me."  (Hood Depo. at 45).

[10]Defendant Harris is currently a Program Supervisor with the Children's Trust Fund and has been in this position since September 2004; the Children's Trust Fund is an independent State of Connecticut agency but for administrative purposes is affiliated with the DCF. (Defendants' Statement ¶ 59; Harris Aff't ¶ 3).  Defendant Harris was a Program Supervisor for the investigations unit from April 1997 until October 2001 and then was transferred to the Permanency Planning and Probate Unit with DCF from October 2001 until May 2003.  (Defendants' Statement ¶ 60; Harris Aff't ¶ 4).  Defendant Harris has been with the State of Connecticut since September 1980 and was with DCF from March 1988 until September 2004.  (Defendants' Statement ¶ 61; Harris Aff't ¶ 5).

because that unit always needed people, and this unit would be a better fit for her in that the deadlines were not as stringent as in the investigations unit.  (Defendants' Statement ¶ 65; Harris Aff't ¶ 9).  Plaintiff was transferred at the same time another worker, who was also an African-American female, was transferred to another unit.  (Defendants' Statement ¶ 66; Harris Aff't ¶ 10).  Plaintiff's transfer was a business decision based upon the needs of the agency and based on a decision to provide plaintiff with an environment where she could better meet deadlines; it was unrelated to her race.  (Defendants' Statement ¶ 67; Harris Aff't ¶¶ 9, 11).

Shortly after plaintiff's transfer, defendant Harris was also transferred to the probate unit where she became plaintiff's supervisor again.  (Defendants' Statement ¶ 69; Harris Aff't ¶ 13).  Defendant Harris is not aware that Hood ever filed a grievance regarding her transfer, nor did plaintiff file a grievance or complaint regarding defendant Harris becoming her Program Supervisor in the probate unit.  (Defendants' Statement ¶¶ 68-69; Harris Aff't ¶¶ 12, 14).

Plaintiff was never suspended, terminated or demoted while with DCF.  (Defendants' Statement ¶ 70; Hood Depo. at 84-85).  Plaintiff took medical retirement from the State of Connecticut on or about January 17, 2003.  (Defendants' Statement ¶ 71; Hood Depo. at 5-6).

### B. DEFENDANTS' MOTION

Defendants assert that plaintiff's claim against Charles Frazier regarding his threat to fire her fails because he is not a named defendant, and such claim is time-barred (Dkt. #140, at 8); all claims based upon conduct against defendants Moore and Sanchez that occurred before 1998 are time-barred (id. at 8-9); plaintiff cannot prove a constitutional claim

premised on a violation of her right to equal protection (id. at 9-12); plaintiff's claim against defendants Moore, Brooks, Lacomba and Ragaglia fail for lack of personal involvement (id. at 12-14); plaintiff's Section 1981 claim fails because Section 1983 is the exclusive federal remedy for the alleged violation of her constitutional rights (id. at 14-16); plaintiff's Section 1981 claim fails to state a claim upon which relief can be granted as plaintiff can put forth no evidence that defendants treated her in a discriminatory manner because of her race (id. at 17-18); plaintiff cannot prove discrimination based upon a "class of one" since she cannot demonstrate that she was treated differently from others similarly situated and that there was no rational basis for the difference in treatment (id. at 18-22); and defendants are entitled to judgment in their favor on plaintiff's state law claim of intentional infliction of emotional distress (id. at 22-23).[11]

        1. COUNT FOURTEEN– EQUAL PROTECTION CLAIM  AGAINST DEFENDANTS
        SANCHEZ, MOORE, BROOKS, HARRIS, LEWIS, LACOMBA AND RAGAGLIA[12]

        In Count Fourteen of the Third Amended Complaint, plaintiff alleges that she was subjected to disparate treatment in her work environment resulting from her race, ethnic origin and gender, in violation of the Fourteenth Amendment and 42 U.S.C. § 1983.  (At 22-23).  Defendants argue that plaintiff cannot prove a prima facie case of race discrimination that violates equal protection as plaintiff cannot show that the defendants in this case intentionally violated her constitutional rights by treating her differently than similarly treated employees because of her race.  (Dkt. #140, at 9-10).  Additionally, plaintiff's claims against

---

[11]Additionally, defendants observe that while Count Thirty-three of the Third Amended Complaint sets forth a claim by all the plaintiffs against DCF under Title VII for a pattern and practice of disciplining black male employees, such Count does not on its face apply to this black female social worker.  (Dkt. #140, at 1, n.2; see Third Amended Complaint, at 34-35).

[12]Plaintiff does not identify any wrongful acts by defendants Ragaglia or Lacomba, both of whom appear to be named as nominal individual defendants.

defendants Moore and Sanchez involve conduct that occurred prior to 1998 and thus are time-barred.  (Id. at 8-9).

As this Court observed in its June 2005 Ruling (at 9-10) and again in its January 2006 Ruling (at 11-12), to state a claim under the Equal Protection Clause of the Fourteenth Amendment, plaintiff must allege that (1) she, compared with other similarly-situated individuals, was selectively treated, and (2) this differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.  Harlen Assocs. v. Incorporated Village of Mineola, 273 F.3d 494, 499 (2d Cir. 2001)(citations & internal quotation marks omitted).  With respect to the second element, "this Circuit has traditionally required that a plaintiff alleging selective treatment show an illicit motivation or animus on the part of the defendant."  Zavatsky v. Anderson, 3:00 CV 844(AVC), 2004 WL 936170, at *8 (D. Conn. Mar. 9, 2004), citing Giordano v. City of New York, 274 F.3d 740, 751 (2d Cir. 2001).  A "demonstration of different treatment from persons similarly situated, without more, would not establish malice or bad faith." Crowley v. Courville, 76 F.3d 47, 53 (2d Cir. 1996)(citation omitted).

### a. SOCIAL WORKER SUPERVISOR TEST

Plaintiff alleges that in March 1995, she was "wrongfully denied the opportunity to take a test to be qualified to become a Social Worker Supervisor for defendant DCF."  (Third Amended Complaint ¶ 61).  The job announcement for the Social Worker Supervisor examination noted that candidates required a combination of college training and experience totaling seven years, and that current state employees, as of January 7, 1991, could qualify for the Social Worker Supervisor examination without an M.S.W. or M.C.W. degree.  (Job

13

Announcement).  According to plaintiff, Phillip Obregón informed her that she was not eligible for the examination, and on or about March 13, 1995, plaintiff received a letter from DAS, informing her that she would not sit for the Social Worker Supervisor examination because she did not possess the minimum experience and training required for admittance to the examination.  (Hood Depo. at 11; March 13, 1995 Letter).  Specifically, plaintiff was informed by DAS that "the reason for not meeting these qualifications is lack of required general experience."  (March 13, 1995 Letter)(emphasis omitted).  On March 30, 1995, plaintiff appealed her denial of entrance to the Social Worker Supervisor examination by forwarding a letter to Nicholas Visone at DAS.  (March 30, 1995 Letter).  Plaintiff testified that none of her supervisors, and none of the named defendants, denied her the opportunity to take the test to be a DCF supervisor, and plaintiff did not file a complaint with the Connecticut Commission on Human Rights and Opportunities regarding this issue.  (Hood Depo. at 11-12).  Further, plaintiff did not testify or present any documentary evidence showing other incidents that would establish that she was treated differently than similarly situated non-minority employees with regard to this examination.

Even if plaintiff could establish an Equal Protection claim for the denial of the opportunity to take this examination, which evidence recited above does not support, plaintiff alleges that this denial occurred in 1995.  Accordingly, plaintiff's claim is barred by the three year statute of limitations governing Section 1983 and 1981 actions.  See Curto v. Edmundson, 392 F.3d 502, 504 (2d Cir. 2004)(citations omitted), cert. denied, 545 U.S. 1133 (2005).

### b. THREATENED FIRING

As stated earlier, plaintiff suffered two work-related injuries in 1995, one in April and

14

one in October.  (Hood Depo. at 12-13; see Third Amended Complaint ¶ 62).  Plaintiff alleges that in July 1996, when she returned to work and requested aid to lift an infant child, Charles Frazier threatened to fire her because of her inability to safely lift and carry this child to whose care plaintiff was assigned.  (Third Amended Complaint ¶¶ 63-64; Hood Depo. at 14-15).  During that year, Frazier offered to move plaintiff to a specialty unit working with high risk newborns rather than sexual abuse and serious injury, but plaintiff declined the offer.  (Hood Depo. at 29-30).  In addition to denying this offer of transfer, plaintiff did not request an accommodation regarding the requirement that she be able to lift a child as part of her job duties.  (Hood Depo. at 16-17).  Thus, plaintiff's claim involving Frazier fails for three reasons: Frazier is not a named defendant; the alleged incident which occurred in 1995 is time-barred and thus not actionable; and plaintiff cannot state a claim under the Equal Protection Clause so as to entitle her to relief.

### c. RUMORS

Plaintiff alleges that in 1995, defendant Sanchez spread rumors that plaintiff was not really hurt and that she did not want to work.  (Hood Depo. at 34-35; Third Amended Complaint ¶ 68).  Plaintiff admitted that she did not think that the comments made by Sanchez were because of her race; rather, according to Hood, Sanchez was just expressing her opinion to those who did not get along with Hood.  (Hood Depo. at 35).  Plaintiff also testified that at this time, defendant Sanchez and another supervisor in plaintiff's unit, Valerie Miles,[13] allegedly denied plaintiff time off to see a doctor; however, plaintiff did not file a complaint with DCF regarding this alleged denial of time off.  (Hood Depo. at 38-39; see Third Amended Complaint ¶ 69).  Plaintiff's claim against defendant Sanchez must fail as

---

[13]Valerie Miles is not a named defendant.

plaintiff has not identified any evidence upon which a constitutional claim can be premised, and even assuming arguendo that she could, plaintiff's own testimony confirms that these alleged acts occurred in 1995, so that plaintiff's claim is time-barred by the three year statute of limitations.

### d. UNEQUAL SUPERVISION

While plaintiff claims that non-African-American members of defendant Moore's unit did not receive the same treatment by defendant Moore "who since 1997 wrongfully failed and refused to hold file closing conferences with plaintiff . . . [and,] wrongfully failed and refused to provide needed supervision to plaintiff," (Third Amended Complaint ¶¶ 65-66), plaintiff testified that she did not know if defendant Moore met with any of the other members of her unit that was made up of white, Hispanic and African-American social workers. (Hood Depo. at 20-21). Plaintiff has not established that she was treated any differently from similarly situated non-minority employees, and even assuming arguendo that she could, plaintiff alleges these acts occurred in 1997 when she was supervised by Moore and thus this claim is time-barred.

### e. REASSIGNMENT

Plaintiff alleges that in November 1996, she was wrongfully transferred to a different unit within DCF and was replaced in defendant Moore's unit by an unqualified Caucasian employee who was a friend of defendant Moore. (Third Amended Complaint ¶ 67). Additionally, according to plaintiff, she was wrongfully removed from defendant Lewis' unit by defendant Harris in or around April 2001. (Id. ¶ 72).

Plaintiff testified at her deposition that in November 1996, Charles Frazier called plaintiff into his office and "said that he wanted to reassign [her] . . . because of [her]

16

attendance." (Hood Depo. at 23-24).   Plaintiff admitted that she had been out of work often because of her work-related injuries, and that she "would think" that it would be important to have someone in her job that was there everyday.  (Id. at 24, 28).  According to plaintiff, Frazier transferred her from the "specialty unit" for sexual abuse and serious physical injury, to a regular investigations unit where her immediate supervisor was Charles Wiggins.  (Id. at 24-25).  However,  plaintiff also testified that she was offered a job back in a specialty unit about two weeks later.  (Id. at 29; see Section I.B.1.b. supra).  As stated above, Frazier is not a named defendant in this case, and any allegations relating to a reassignment in 1996 would be time-barred.

In 2001, plaintiff was transferred to a different unit by defendant Harris because, according to plaintiff, "she wanted to" after plaintiff filed the grievance for "corrective counseling," following which she was reassigned by defendant Harris. (Hood Depo. at 49-50).  According to Harris, plaintiff's work performance, based in part on work-related injuries, was not up to the level required in the investigations unit.  (Harris Aff't ¶ 8).  She was not performing her duties in a timely manner and her documentation of case-related activities was not complete and not timely.  (Id.; Performance Evaluation).  Plaintiff was informed verbally by Harris that she was being transferred to the probate unit because that unit always needed people and that unit would be a better fit for her in that the deadlines were not as stringent as in the investigations unit.  (Harris Aff't ¶ 9).  Contrary to plaintiff's contention of disparate treatment, plaintiff was transferred at the same time another worker, who was also an African-American female, was transferred to another unit.  (Harris Aff't ¶ 10).  According to Harris, plaintiff's transfer was a business decision based upon the needs of the agency and based upon a decision to provide plaintiff with an environment where she could better meet

17

deadlines; it had nothing to do with plaintiff's race, and plaintiff puts forth no evidence supporting a claim that this transfer was race-based.    (Harris Aff't ¶¶ 9, 11).    Additionally, Harris averred that she is not aware that Hood ever filed a grievance regarding her transfer, nor did plaintiff file a grievance or complaint regarding Harris becoming her Program Supervisor again in the probate unit.  (Harris Aff't ¶¶ 12, 14).

### f. SEXUAL ADVANCES

_____ Defendant  Lewis, an African-American female, has been with DCF since 1989 and has held a Social Worker Supervisor position since 2001.  (Lewis Aff't ¶¶ 3-5).   According to plaintiff, defendant Lewis wrongfully subjected plaintiff to sexual advances and touching, on ten or so occasions, in the spring of 1999.[14]  (Third Amended Complaint ¶ 70; Hood Depo. at 41-42).  Plaintiff testified that she voiced complaints to her co-workers, but never told a supervisor or someone in a management position, so it would be fair to say that management in her office may not have known about this behavior.  (Hood Depo. at 42).

Defendant Lewis avers that she never touched plaintiff inappropriately, that plaintiff's allegation is flatly false, that plaintiff never told her that she touched her inappropriately, that she never took an adverse employment action against plaintiff, and that she never treated plaintiff differently than any other member of her unit.  (Lewis Aff't ¶¶ 8-10, 12).  Moreover, DCF has "detailed policies regarding reporting a complaint about inappropriate contact and no one from DCF ever contacted [Lewis] about such an allegation." (Lewis Aff't ¶ 11). According to defendant Lewis, if anything, she treated plaintiff with more understanding than others based upon plaintiff's medical circumstances and did not assign plaintiff to cases that

---

[14]Plaintiff testified that although she alleges that this wrongful conduct occurred in October 2000 in her Third Amended Complaint, it really occurred in the spring of 1999, and stating that it happened in October 2000 was a typographical error.  (Hood Depo. at 41).

would take a lot of overtime unless she consulted with her based on her medical condition. (Lewis Aff't ¶ 12).

Plaintiff's own testimony undermines her claim for inappropriate sexual touching against defendant Lewis as plaintiff explicitly testified that she did not notify DCF management regarding any inappropriate action by Lewis and that DCF management may not have known anything about any alleged inappropriate touching since plaintiff only told her co-workers.  (Hood Depo. at 41-42).  Moreover, while plaintiff has a history of filing grievances, she never filed one against defendant Lewis for this alleged behavior (see Interrogatory Responses at 7), and even bases a claim in this action upon a reassignment from Lewis' unit (Third Amended Complaint ¶ 72), which is largely inconsistent with plaintiff's claim of inappropriate sexual touching.

### g. ORDERED TO LEAVE WORK

Plaintiff contends that defendant Lewis wrongfully subjected plaintiff to disparate treatment than accorded to non-African-American members of her unit, including but not limited to being ordered to leave the office after returning from a medical leave in October 2001, being assigned corrective counseling due to unprocessed cases (see Section I.B.1.e. supra), and wrongful scrutiny of work.  (Third Amended Complaint ¶ 71).  Plaintiff testified that in January 2000,[15] she had difficulty breathing and chest pains while she was at work. (Hood Depo. at 44).  She was taken to the hospital and when she returned to work the following day, she was asked to leave because she "needed to provide medical certification," which she provided the following day, at which time plaintiff was able to return to work.

_____

[15]Plaintiff testified that she "think[s] it was in 2000[,] . . . possibly January" when this happened (Hood Depo. at 44), as opposed to October 2001 as alleged in her Third Amended Complaint, ¶ 71.

(Id. at 44-45).  Lewis confirmed that her Program Supervisor Linda Harris told her that the medical certification was a requirement for plaintiff to return to work.  (Lewis Aff't ¶ 13).

Plaintiff is not aware of any white employees who were treated differently regarding the DCF policy requiring a medical certificate to return to work.  (Hood Depo. at 47).  Additionally, plaintiff testified that she did not think that she was prevented from returning to work without the medical certification because of her race; rather, she thought she needed the certification "just because of me."  (Id.  at 45).   Finally, although plaintiff complained that her work was unduly scrutinized by defendant Lewis, she admitted that she is unaware if other people's work was similarly scrutinized.[16]  (Hood Depo. at 48-49).

### h. LACK OF PERSONAL INVOLVEMENT

As to each of the foregoing issues, defendants correctly contend (Dkt. #140, at 12-14) that plaintiff cannot carry her burden of showing personal involvement by defendants Moore, Brooks, Lacomba and Ragaglia, and plaintiff did not even identify any conduct by defendant's Brooks, Lacomba and Ragaglia.  Thus, there is no evidence that plaintiff suffered a constitutional deprivation that can be imputed to these defendants.

### i. "CLASS OF ONE"

In order for plaintiff to prove an equal protection claim based on a "class of one theory," wherein "the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment," Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)(citations omitted),  plaintiff must demonstrate that

---

[16]Plaintiff did testify, however, that after speaking with other people in the unit, she knew that Lewis did not "put anyone else on corrective counseling but [her]self."  (Hood Depo. at 49).

> (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and
> (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake.

Neilson v. D'Angelis, 409 F.3d 100, 108 (2d Cir. 2005)(citation omitted).  While there is sparse evidence before the Court that plaintiff was treated differently from others similarly situated, plaintiff cannot satisfy her burden as articulated by the Second Circuit, and even if she could, there is ample evidence before the Court that defendants had a rationale basis for their conduct.  Specifically, as stated above, plaintiff was informed that she was not permitted to sit for the promotional examination in 1995 because she was not qualified for the position (March 13, 1995 Letter), Frazier wanted to reassign plaintiff in November 1996 because of her attendance and plaintiff acknowledged that it would be important to have someone in her job that was there everyday (Hood Depo. at 23-24, 28), she was reassigned to a different unit in 2001 based upon the needs of the agency and based upon a decision to provide plaintiff with an environment where she could better meet deadlines  (Harris Aff't ¶¶ 9, 11), and Lewis confirmed that a medical certification was a requirement for plaintiff to return to work after a hospitalization  (Lewis Aff't ¶ 13).  Moreover, plaintiff was never suspended, terminated or demoted while with DCF. (Hood Depo. at 84-85).  Plaintiff was employed until she took medical retirement from the State of Connecticut on or about January 17, 2003. (Hood Depo. at 5-6).

        Thus, viewing inferences that may be drawn from the underlying facts contained in defendants' materials in the "light most favorable to the party opposing the motion," Adickes, 398 U.S. at 158-59 (citation omitted), plaintiff's Count Fourteen does not survive summary judgment.

2. COUNT FIFTEEN – 42 U.S.C. § 1981 CLAIM AGAINST DEFENDANTS
SANCHEZ, MOORE, BROOKS, HARRIS, LEWIS, LACOMBA AND RAGAGLIA

In Count Fifteen of the Third Amended Complaint, plaintiff alleges that defendants Sanchez, Moore, Frazier,[17] Brooks, Harris, Lewis, Lacomba and Ragaglia knew of ongoing discrimination against plaintiff due to plaintiff's race, in violation of 42 U.S.C. § 1981, and failed to remedy the wrong while occupying positions in which they were required to do so. (At 23-24).

Defendants correctly observe that "when a person's rights protected by § 1981 are violated by a state actor (as opposed to a private person), the aggrieved party has a cause of action pursuant to 42 U.S.C. § 1983, not 42 U.S.C. § 1981." Smith v. Conn. Dep't of Corr., 3:03 CV 386(AWT) , 2003 WL 22834676, at *2 (D. Conn. Nov. 25, 2003); see also Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 (1989); Coger v. State of Conn. Dep't of Admin. Servs., 309 F. Supp. 2d 274, 281 (D. Conn. 2004).  The U.S. Supreme Court had held that § 1983 provides "the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units." Jett, 491 U.S. at 733 (emphasis added).  Furthermore, 42 U.S.C. § 1983 is "a method for vindicating federal rights elsewhere conferred," Baker v. McCollan, 443 U.S. 137,144 n. 3 (1979), "such as those conferred by § 1981." Patterson v. County of Oneida, 375 F.3d 206, 225 (2d Cir. 2004).

Even assuming arguendo that plaintiff can maintain a  § 1981 claim against state actors, plaintiff must allege and prove that the individual defendants' acts were "purposefully discriminatory and racially motivated." Albert v. Carovano, 851 F.2d 561, 571-72 (2d Cir.

_____

[17]Frazier is not a named defendant in this case.  (See Third Amended Complaint, ¶ 4).  Accordingly, as defendants correctly observe, and as stated above, plaintiff's claims against Frazier are not actionable.  (See Dkt. #140, at 8, 12).

22

1998)(multiple citations omitted).  For the reasons stated in Section I.B.1. supra, plaintiff cannot sustain her burden of proof to state a claim under 42 U.S.C. § 1981, so that Count Fifteen similarly does not survive summary judgment.



### 3. COUNT SIXTEEN - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AS TO  DEFENDANTS SANCHEZ, MOORE, BROOKS, HARRIS, LEWIS, LACOMBA AND RAGAGLIA

In Count Sixteen of the Third Amended Complaint, plaintiff alleges that defendants Sanchez, Moore, Brooks, Harris, Lacomba, and Ragaglia intended to inflict emotional distress, or knew or should have known that emotional distress was likely to occur as a result of their conduct; they acted maliciously, in bad faith, with improper motive and with reckless disregard for the consequences that their actions would have on plaintiff; their conduct was extreme and outrageous; and plaintiff's emotional trauma was severe and as a result, plaintiff suffered anxiety, humiliation, embarrassment and emotional distress.  (At 24).

Under Connecticut law, the common law tort of intentional infliction of emotional distress requires that four elements be established: (1) the defendant intended to inflict emotional distress or knew or should have known that it would result; (2) the defendant's conduct was extreme and outrageous; (3) the conduct caused the plaintiff's distress; and (4) the plaintiff's resulting emotional distress was severe.  Petyan v. Ellis, 200 Conn. 243, 253 (1986)(multiple citations omitted).  Extreme and outrageous conduct is that which "go[es] beyond all possible bounds of decency, [is] regarded as atrocious, and [is] utterly intolerable in a civilized society."  Appleton v. Bd. of Educ. of the Town of Stonington, 254 Conn. 205, 211 (2000)(quotations & citation omitted).  It does not include conduct that is "merely insulting or displays bad manners or results in hurt feelings."  Id. (citation omitted).

As discussed in detail in Section I.B.1.  supra, plaintiff has not alleged that any of the

23

defendants did anything egregious towards plaintiff or engaged in conduct rising to the level of extreme and outrageous.   It is clear that allegations of rumors about plaintiff's work-related injuries, that defendant Moore did not meet with plaintiff, and that plaintiff was transferred from one unit to another without her approval is simply not conduct that arises beyond "all possible bounds of decency." Appleton, 254 Conn. at 211.[18]  Therefore, Count Sixteen does not survive summary judgment.

## II. CONCLUSION

For the reasons stated above, defendants' Motion for Summary Judgment (Dkt. #139) is **granted, absent objection**.[19]

Dated this 26th day of February, 2007, at New Haven, Connecticut.


/s/_____
Joan Glazer Margolis
United States Magistrate Judge

---

[18]Plaintiff offers no evidence to substantiate her claim of inappropriate sexual touching by defendant Lewis and the evidence presented in support of this motion is directly to the contrary.

[19]By prior agreement of counsel, defendants' Motion for Summary Judgment with regard to plaintiff Whilby will be filed **on or before March 26, 2007**.  (Dkt. #131, ¶ 2).

In addition, counsel shall contact the Magistrate Judge's Chambers to schedule a settlement conference, with the three remaining plaintiffs present, as well as a representative for the remaining defendants.