## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RYAN WILLIAMS | : | CIVIL ACTION NO: |
| | : | |
| vs. | : | 3:01CV 1398 (JBA) |
| | : | Magistrate Judge Margolis |
| KRISTINE RAGAGLIA, | : | |
| COMMISSIONER, DEPARTMENT | : | |
| OF CHILDREN AND FAMILIES | : | |
| and IN HER INDIVIDUAL | : | |
| CAPACITY, ET AL | : | November 27, 2007 |

## MEMORANDUM IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## WITH RESPECT TO REGINA WHILBY

### I.    INTRODUCTION

Defendants have moved for Summary Judgment as to Plaintiff Regina Whilby on Counts 20 (§1983), 21 (§1981), 22 (emotional distress), 24 (Title VII) and 25 (CFEPA) of the Third Amended Complaint.  Plaintiff Regina Whilby does hereby file this Memorandum in Opposition to the claims as to Counts 20, 21, 24, and 25.  Plaintiff Whilby withdraws her claim as to Count 22.

### II.    FACTS

### A.    AS TO REGINA WHILBY

Regina Whilby is a black, African American woman and citizen of the United States. She was hired by Defendant DCF and began to work as a Social Worker Trainee on January 28, 2000, to work in the Bridgeport office.  She commenced training and performed her work as a trainee in a satisfactory manner but never received a performance evaluation.   Whilby Affidavit, ¶¶ 3 - 5.

1

In February, 2000, as part of the training, she attended a Cultural Diversity Training course. The instruct or was Ms. Renee Huff.   During one class session, there was a discussion concerning interracial matters in the workplace.  Ms. Whilby spoke up during that class and, to her detriment, as it turns out, complained about discrimination that she had observed at DCF prior to that class. Whilby Affidavit, ¶¶ 6 - 7.

What had happened was that she and one of her co-trainees, an African American, approached their supervisor, Ms. Beverly Hubblebank, who told them to go to her supervisor, Ms. Hamilton, to ask her to sign their timesheets so that they could be paid overtime.  The two of them did so.  Ms. Hamilton  took the timesheets and put them in a basket on her desk, saying she would get to it later.  As Ms. Whilby and the other black employee left her office, two white co-trainees came in with the same request.  Ms. Hamilton signed them immediately as Ms. Whilby and the other black employee watched.    Whilby Affidavit, ¶ 8.  In the class, Ms. Whilby complained that this early on the job she was being subjected to blatant discrimination, as the supervisor took what a white person said about his or her hours at face value, but refused the same trust to black employees. As she was upset by it, she brought this up for discussion in the training class.  Later Ms. Whilby was informed that her statement had become known in the Bridgeport office and discussed there.  At that same class, Jeff Smythe, a white trainee, used the word "nigger" and he was not corrected by the class teacher. He also said that this training was pointless.  After class, Ms. Whilby complained to the teacher, but he did nothing.  That this conduct was tolerated is especially poignant in light of the accusations made in Wanda Estrella's affidavit about an article on interracial dating.   Whilby Affidavit, ¶ 9.

On or about March 6, 2000, Ms. Whilby was in mandatory attendance in a training class in

Hartford, called Introduction to Personal Computers. There were about seven (7) trainees in attendance. The instructor was Ms. Romelia Sharpe. Whilby Aff. ¶ 10. On her direct instruction, the trainees performed various internet functions, including going to web sites and learning about address locations. While Ms. Sharpe stood behind Plaintiff and Raul Parks, Ms. Whilby and Mr. Parks established a Hotmail internet account for him. Ms. Sharpe assisted. Another person, Martha Martelli, was getting married, and used the Internet to research for her wedding and invitations, including printing of materials. Whilby Aff. ¶ 11. During the breaks between segments of the instruction, the entire class continued to access the Internet, with many of the trainees checking personal emails and printing from a variety of sites. Whilby Aff. ¶ 12.

At no time before the events just described did Ms. Sharpe or any other person instruct the trainees that this was not acceptable conduct. In fact, she had encouraged them to do so, writing the names of sites to visit on the blackboard, including bluemountain.com, bearisland.com, and yahoo.com. Ms. Whilby never saw restrictions on personal use of computers posted anywhere in the classrooms that were used. Neither Ms. Sharpe nor any one else had brought it to her attention, and the encouragement that the teacher gave the trainees certainly did make Plaintiff believe, and would have made any of the trainees believe, that any restrictions would not apply to the learning period. Whilby Aff. ¶ 13.

On Wednesday, March 9, 2000, Ms. Whilby was in mandatory attendance in another training class in Hartford, Introduction to Word. Again, the class was instructed to access various internet sites during that class. The instructor was Mr. James Desmond. Whilby Aff. ¶ 14. Again, as in Ms. Sharpe's class, the trainees all continued to access the Internet during the breaks, including email accounts. Again, neither Mr. Desmond, who was watching the class, nor anyone else said that they

should not be doing so.   Whilby Aff. ¶ 15.   Ms. Whilby is absolutely certain that two co-trainees,

Martha Martelli and Jeffrey Smythe, both of whom are white, participated in activities that were later

declared inappropriate, and did so in front of Mr. Desmond.  She saw Martha Martelli print out an

email that she had received.  Neither of them were disciplined.  Whilby Aff. ¶ 16.

On Monday March 13, 2000, Regina Whilby was again in another mandatory class,

Introduction to Link.  Ms. Sharpe instructed.  On that same day, Jeff Smythe sent Ms. Whilby and

others in the class an email saying in capital letters and in a very large font (40 points or so) that this

is boring.   Whilby Aff. ¶ 17.

Later that day, in a class with Mr. Desmond, Mr. Desmond said that two people were in

trouble.  At least one of them is in big trouble.  Whilby Aff. ¶ 18.  This time, during one of the

breaks, Ms. Sharpe told the class not to access the Internet during the breaks.  At that point, the

trainees stopped.  Ms. Sharpe herself sent the trainees an email using graphics, in this case a

leprechaun.  Plaintiff's understanding from the written policy is that graphics are forbidden.  Whilby

Aff. ¶ 19.

On March 14, 2000, Ms. Whilby was called into a meeting in the Bridgeport office of DCF

with Beverly Hubblebank, Dorothy Hamilton and Judith Kallen.  She was immediately told that my

employment was terminated for misuse of state property by accessing the Internet. This occurred

before she had a chance to give a defense.  Whilby Aff. ¶ 20.  She did tell them that all of the class

had done the same thing and that it was not prohibited by the teachers.  She also told them it was

unfair to fire her as an example.  Contrary to the claim of Wanda Estrella, Ms. Whilby did not admit

to "inappropriate conduct".  They claimed that the only evidence they had of any trainee accessing

the Internet pointed just to her.  This was factually false as Mr. Desmond watched all of the trainees

4

do the same thing and had directed Jeff Smythe to stop at one point, and the email in question was not even printed by Plaintiff. Whilby Aff. ¶ 21.

Wanda Estrella claims (¶ 9 of her Affidavit) that Ms. Whilby participated in an action that was degrading to white women by printing an article on interracial dating. That is false. Ms. Whilby had received an email commenting on this article, which was published in a national magazine. The concern of the email was that black women, not white women, were badly portrayed in the article. Ms. Whilby did not print the article but kept it to read it when she had no work obligations. She acknowledged that she did forward it to another trainee, Marcia Taylor, who did print it. Defendants' Ex. 3 comes from Ms. Taylor's email, and constitutes an email to her from Ms. Whilby, which Ms. Taylor, not Ms. Whilby, printed through her service - Excite. Plaintiff's service was through AOL. No punishment was given to Ms. Taylor, who printed the email. Ms. Whilby did not participate in any disparagement of black men or black women or interracial dating. The attitude of the writer of the article was very troubling to her and she had already heard about it from other African American women who had discussed it. The fact that Wanda Estrella considered the article disparaging of white women, in spite of Defendants' Ex. 3, evidences a racial motivation for her action in participating in Plaintiff's termination. Whilby Aff. ¶ 22.

Wanda Estrella further claims that Ms. Whilby left this "racially charged" email out for others to see. She did not leave it out. Wanda Estrella was not present and could not possibly swear under oath that Plaintiff did so (even though she has apparently tried to do so). Whilby Aff. ¶ 23.

The State of Connecticut sent Ms. Whilby a letter the following day stating that she was terminated. Whilby Aff. ¶ 24.

Later, Plaintiff met afterwards with Wanda Estrella. At that meeting, Ms. Estrella asked Ms.

Whilby if she (Ms. Whilby) knew that this use of email and the Internet was prohibited. Ms. Whilby responded  that she was participating in the class work and denied that knowing it to be wrong. Whilby Aff. ¶ 25.

When Wanda Estrella states that Jeff Smythe did not access his personal email and did not print a document, she is not making a true statement. Ms. Whilby was there and saw him do so herself. He sent graphics and large emails to friends.. Mr. Desmond told him to stop. He was not punished. Wanda Estrella was not present and does not have the ability to swear under oath what Jeff Smythe  did or did not do. Whilby Aff. ¶ 26.

Plaintiff  knows of no other emails which involved her. Defendants have made reference to an email printed by Mr. Desmond with her name on it, but Ms. Whilby know nothing of this email. Whilby Aff. ¶ 27.

**B.    AS TO THE CONSENT DECREE**

In 1991 a Consent Decree entered in the case of *Juan F. vs. O'Neill*, U. S. District Court, Docket No. 89-cv-859 (AHN). Relevant portions are attached. As part of that decree, DCF was required to engage in affirmative action in the hiring of social workers and supervisors. VIII.E.(1)(a), pp. 35-36.

As Commissioner of DCF, Defendant Christine Regaglia was charged with the implementation and compliance with the Consent Decree. As head of personnel at DCF, Wanda Estrella was the manager who would have direct responsibility for compliance with the employment and promotion provisions of the Consent Decree and who would be responsible to report to the Commissioner as to what was done to effectuate that compliance.

## C.    AS TO THE PATTERN OF DISCRIMINATION

As shown by the Affidavit of Sal Luciano, who was President of AFSCME Social and Human Services (P2) Bargaining Unit, which represented employees of the Department of Children and Families ("DCF") throughout the State of Connecticut at the times relevant hereto, a study was undertaken by the union at his request regarding race and disciplinary actions at DCF. Luciano Affidavit ¶¶ 2 - 5. Luciano found that discipline was handed out disproportionately to black personnel (especially black men) when compared to their representation as employees of DCF and he found this significant enough to report it to the CHRO Board of the State Legislature. Luciano Affidavit, ¶ 6.

## III.    STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides for the granting of a summary judgment motion if "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The purpose of summary judgment is to determine whether a trial will be necessary. "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby. Inc.*, 477 U.S. 242, 247-48 (1986). However, "[t]he [Plaintiff's] burden of establishing a prima facie case... is not onerous" *Fisher v. Vassar College*, 114 F.3d. 1332 (2d. Cir. 1997) citing *Texas Dept. Of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). In fact, Plaintiff's burden of establishing a prima facie case of discrimination has frequently been described as "minimal." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993).

In a motion for summary judgment, the burden is on the moving party to establish that there

are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Although the moving party has the initial burden of establishing that no factual issues exist, once that burden is met, "the opposing party must set forth specific facts demonstrating that there is a genuine issue for trial." *Sylvestre v. United States*, 771 F.Supp. 515, 516 (D.Conn. 1990).

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is warranted. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "In such a situation, there can be no 'genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23.

The Court must "resolve all ambiguities and draw all inferences in favor of the nonmoving party." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d. Cir. 1992). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Mafucci*, 923 F.2d 979, 982 (2d. Cir. 1991).

Nor is it necessary for Plaintiff at the time of summary judgment to discredit all of the reasons proffered by Defendant: The Third Circuit Court of Appeals addressed the issue this way:

> As we stated in Fuentes, the employee need not always offer evidence sufficient to discredit all of the rationales advanced by the employer. "If the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder." 32 F.3d at 764 n. 7; see also Kautz, 412 F.3d at 467; Abramson v. William Paterson Coll. of New Jersey, 260 F.3d 265, 283 (3d Cir. 2001). In Fuentes, we explained that the rejection of some explanations may so undermine the employer's credibility as to enable a rational factfinder to disbelieve the remaining rationales, even where the employee fails to produce evidence particular to those rationales. 32 F.3d at 764 n. 7.

8

*Tomasso v. Boeing Company*, 445 F. 3d 702 @ 707 (3rd Cir. 2006).

**IV.    ARGUMENT**

    **A.    INTRODUCTORY**

       Federal law, as set forth in 42 U.S.C. § 1983 makes it clear that an employer cannot discriminate on the basis of race or sex against the plaintiff in her terms and conditions of employment, which includes any denial of promotion, disciplinary actions, and termination of employment.  An employer may not intentionally deny a promotion to the plaintiff because she is a minority or a female and promote a white or male job applicant without regard to qualifications, because of race and sex.   *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981); *St. Mary*'*s Honor Center v. Hicks*, 509 U.S. 502, 505-512 (1993); *Furnco Construction Corp v. Waters*, 438 U.S. 567, 577 (1978); *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994); *De la Cruz v. New York City Human Resources Admin.*, 82 F.3d 16, 20 (2d Cir. 1996)(quoting *Powell v. Syracuse University*, 580 F.2d 1150, 1155 (2d Cir.) cert denied, 439 U.S. 984 (1978)(alteration in original); *Owens v. New York City Housing Authority*, 934 F.2d 405, 409 (2d Cir.), cert. denied, 502 U.S. 964 (1991); *Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219, 1224 (2d Cir. 1994); *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2nd Cir. 1989).

       A jury is entitled to infer, but need not, that the Plaintiff has met her ultimate burden of demonstrating intentional discrimination by a preponderance of the evidence if it finds that plaintiff is a member of a racial minority, that she applied for and was qualified for an available position, that she was rejected, and that after she was rejected defendant either continued to seek applicants for the position, or, as is alleged here, filled the position with a white or hispanic employee and and the jury

disbelieves the DCF*'s explanation for the adverse employment action. *Cabrera v. Jakabovitz*, 24 F.3d 372, 382 (2d Cir.1994); *Texas Dep*ˮt *of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

In determining pretext, and thereby intent, a jury may also consider evidence that the employer deviated from its established rules or procedures in dealing with the plaintiff.. *Brown v A. J. Gerrard Mfg. Co.*, 643 F2d 273, (5th Cir.1981); *Lindsey v Angelica Corp.*, 508 F Supp 363, (E.D.Mo.1981). In this case, evidence of unequal treatment of white and black trainees or of trainees who have raised an issue of discrimination about a supervisor would be evidence of pretext.

### B.    PLAINTIFF HAS A VALID CLAIM UNDER § 1983

Defendants' claim, stated on Pages 7 and 8 of their Brief is as follows:

> In the present case, Plaintiff cannot show that the Defendants Hubblebank, Kallen, Estrella, Solera and Ragaglia took any adverse action against her, much less intentionally violated her constitutional rights by treating her differently than similarly treated [sic] employees BECAUSE of her ***race or gender***.   [emphasis in original]

Presumably, in the fourth line "situated" was intended in place of "treated".

First, the termination of Regina Whilby was an adverse action.  Second, on the basis of Regina Whilby's Affidavit, and the contested facts set forth therein, it is likely that a jury will find that the action was taken on a race basis as other persons, who were white and not similarly situated, were treated differently, and were treated differently on a consistent basis throughout the training period.  Third, these disputed facts directly link Hubblebank and Estrella to the adverse action based on race, and, as shown below, indirectly to Commissioner Ragaglia.

As appears from the Plaintiff's Rule 56a2 Statement, much of what Defendants seem to believe is uncontested is in fact contested.  In fact, much more is contested.  In addition to the

allegations denied in Part 1 thereof and in addition to the allegations challenged in the accompanying Motion to Strike much of Wanda Estrella's Affidavit as not based on personal knowledge, Plaintiff has listed the following facts, to which she does not expect Defendants to agree:

1. Plaintiff performed her work as a trainee in a satisfactory manner. She never received a performance evaluation. Whilby Affidavit, ¶ 5.

2. In February, 2000, as part of the training, Plaintiff attended a Cultural Diversity Training course. The instructor was Ms. Renee Huff. Whilby Affidavit, ¶ 6.

3. During one class session, there was a discussion concerning interracial matters in the workplace. Plaintiff spoke up during that class. She complained about discrimination that she had observed at DCF prior to that class. Whilby Affidavit, ¶ 7.

4. What had happened was that one of her co-trainees, an African American, and Plaintiff approached our supervisor, Ms. Beverly Hubblebank, who told them to go to their supervisor, Ms. Dorothy Hamilton, to ask her to sign their timesheets so that they could be paid overtime. They did so. Ms. Hamilton took the timesheets and put them in a basket on her desk, saying she would get to it later. As they left her office, two white co-trainees came into her office with the same request. Ms. Hamilton signed them immediately as we watched. This shows an innate distrust of black people by Ms., Hamilton as well as racial discrimination in actual treatment of employees. Whilby Affidavit, ¶ 8.

5. As Plaintiff was upset by that incident, she brought this up for discussion in the training class. She was later told that her statement had become known in the Bridgeport office and discussed there. At that class, Jeff Smythe, a white trainee, used the word "nigger" and he was not corrected by the class teacher. He also said that this training was pointless. Plaintiff went to the

teacher afterward but she did nothing.   Whilby Affidavit, ¶ 9.

6.      On or about March 6, 2000, Plaintiff was in mandatory attendance in a training class in Hartford, called Introduction to Personal Computers.  There were about seven (7) trainees in attendance.  The instructor was Ms. Romelia Sharpe.  Whilby Affidavit, ¶ 10.

7.      On her direct instruction, the trainees performed various internet functions, including going to web sites and learning about address locations.  While Ms. Sharpe stood behind Plaintiff and Raul Parks, Plaintiff and he established a Hotmail internet account for him.  Ms. Sharpe assisted. Another person, Marsha Martelli, was getting married, and used the Internet to conduct research for her wedding and invitations, including printing of materials.  Whilby Affidavit, ¶ 11.

8.      During the breaks between segments of the instruction, the entire class continued to access the Internet, with many of the trainees checking personal emails and printing from a variety of sites.  Whilby Affidavit, ¶ 12.

9.      At no time before the events just described did Ms. Sharpe or any other person instruct the trainees that this was not acceptable conduct.  In fact, she had encouraged them to do so and specified certain non-work related web sites as examples by writing them on the board, including bluemountain.com, bearisland.com, and yahoo.com.  Plaintiff never saw restrictions on personal use of computers posted anywhere in the classrooms that the trainees used.  Neither Ms. Sharpe nor any one else had brought it to the attention of the trainees, and the encouragement that she gave them would have made any of them believe that any restrictions would not apply to the learning period. Whilby Affidavit, ¶ 13.

10.     On Wednesday, March 9, 2000, Plaintiff was in mandatory attendance in another training class in Hartford, Introduction to Word.  Again, the trainees were allowed during the breaks

to access various internet sites during that class.  The instructor was Mr. James Desmond.  Whilby Affidavit, ¶ 14.

11.    Again, as in Ms. Sharpe's class, the trainees all continued to access the Internet during the breaks, including email accounts.  Again, neither Mr. Desmond, who was watching them, nor anyone else said that they should not be doing so.   Whilby Affidavit, ¶ 15.

12.    Plaintiff knows with absolute certainty that two co-trainees, Marsha Martelli and Jeffrey Smythe, both of whom are white, participated in activities that were later declared to be inappropriate.   She saw Marsha Martelli print out an email that she had received.  This was done in the presence of Mr. Desmond.  Neither of them were disciplined.  Whilby Affidavit, ¶ 16.

13.    On Monday March 13, 2000, Plaintiff was again in another mandatory class, Introduction to Link.  Ms. Sharpe instructed.  On that same day, Jeff Smythe sent Plaintiff and several people in  the class an email saying in capital letters and in a very large font (40 points or so) that this is boring.  Whilby Affidavit, ¶ 17.

14.    Later that day, in a class with Mr. Desmond, Mr. Desmond said that two people were in trouble.  At least one of them is in big trouble.  Whilby Affidavit, ¶ 18.

15.    This time, during one of the breaks, Ms. Sharpe told the trainees not to access the Internet during the breaks.  At that point, they stopped.  Ms. Sharpe herself sent the trainees an email using graphics, in this case a leprechaun.  It is the understanding of Plaintiff  from the written policy that graphics are forbidden.  Whilby Affidavit, ¶ 19.

16.    On March 14, 2000, Plaintiff was called into a meeting in the Bridgeport office of DCF with Beverly Hubblebank, Dorothy Hamilton and Judith Kallen.  She was immediately told that her employment was terminated for misuse of state property by accessing the Internet.   Whilby

13

Affidavit, ¶ 20.

17.    Plaintiff told them that all of the class had done so and that it was not prohibited by the teachers.  She also told them it was unfair to fire her as an example.  Plaintiff did not admit to "inappropriate conduct".  They claimed that the only evidence they had of any trainee accessing the Internet pointed just to her.  But Mr. Desmond had watched all of the trainees do the same thing and had directed Jeff Smythe to stop at one point,  and the email in question was not even printed by Plaintiff.  Whilby Affidavit, ¶ 21.

18.    Wanda Estrella  claims (Affidavit, ¶ 9) that Plaintiff participated in an action that was degrading to white women by printing an article on interracial dating.  That is false.  Plaintiff had received an email commenting on this article, which was published in a national magazine.   The concern of the email was that black women, not white women, were badly portrayed in the article. Plaintiff did not  print the article but kept it to read it when she had no work obligations.  She did forward it to another trainee, Marcia Taylor, who did print it.  That is Defendants' Ex. 3, which was an email to Ms. Taylor from Ms. Whilby, and which Ms. Taylor  printed through her service - Excite. Plaintiff's service was through AOL, not excite.  No punishment was given to Ms. Taylor.  Plaintiff was not participating in any disparagement of black men or black women or interracial dating.  The attitude of the writer of the article was very troubling to Plaintiff and she had already heard about it from other African American women who had discussed it.  The fact that Wanda Estrella considered the article disparaging of white women, in spite of Defendants' Ex. 3, evidences a racial motivation for her action in participating in my termination.  Whilby Affidavit, ¶ 22.

19.    Wanda Estrella further claims that Plaintiff left a "racially charged" email out for others to see.  Plaintiff did not leave it out.  Wanda Estrella was not present and so testify.  Whilby

Affidavit, ¶ 23.

20.     The State of Connecticut sent Plaintiff a termination letter the following day.  Whilby Affidavit, ¶ 24.

21.     Plaintiff met afterwards with Wanda Estrella.  At that meeting, Ms. Estrella asked Ms. Whilby if she knew that what she did as prohibited.  Plaintiff told her that she was participating in the class work and denied that she knew it to be wrong.  Whilby Affidavit, ¶ 25.

22.     When Wanda Estrella states that Jeff Smythe did not access his personal email and did not print a document, she is not making a true statement.  Plaintiff saw him do so myself.  He sent graphics and large emails to friends..  Mr. Desmond told him to stop.  He was not punished. Wanda Estrella was not present and does not have the ability to so testify.  Whilby Affidavit, ¶ 26.

23.     Plaintiff knows of no other emails which involved her.  Defendants have made reference to an email printed by Mr. Desmond with Plaintiff's name on it, but Plaintiff knows nothing of this email.  Whilby Affidavit, ¶ 27.

24.     In or about year 1999, Sal Luciano, then President of AFSCME Social and Human Services (P2) Bargaining Unit, which represented employees of the Department of Children and Families ("DCF") throughout the State of Connecticut, caused a study to be made of grievances resulting from discipline within DCF.  Luciano Affidavit ¶¶ 3 and 4.

25.     What he found was that there was a large discrepancy between the population of black employees, especially black men, and the frequency of discipline, was significant enough to report it to the CHRO Board of the State Legislature.  Luciano Affidavit ¶ 6.

From the above, it is evident that (1) Hubblebank and Hamilton treated black trainees differently from white trainees; (2) the white instructor, Renee Huff, did nothing when a white

15

person used the word "nigger" in a multicultural sensitivity class; (3) white trainees were not disciplined, let alone terminated, for using the internet or email in training classes; (4) the in class statements of Plaintiff about racial treatment by Hubblebank and Hamilton became known to them; (5) the 1991 Consent Decree evidences a longstanding racial imbalance problem at DCF; (6) the study conducted by Union President Sal Luciano showed that the race problem at DCF was alive and well as respects discipline of black personnel.   In addition to all this, it is submitted that Wanda Estrella's Affidavit, in so far as it deals with the magazine article, shows her racial hostility toward minorities, especially toward black women.

All of the foregoing is evidence that the treatment of Plaintiff was part of a practice and custom of discrimination at DCF, one that treated black people differently from white people, especially if they speak up about discrimination by managers, even in a classroom.  Even more blatantly, when she learned she was fired, Plaintiff told them that they were treating her differently than white people who did the same thing.  In response, they did nothing.  The managers and Wanda Estrella did not discipline any other person, even on direct evidence from Plaintiff.  They never had the intention to do so.

As Commissioner Ragaglia bore the burden of implementation of the Consent Decree, it directly fell to her to know if black employees were being treated fairly.  This specific burden was supplementary to her general burden under Conn. Gen. Stat. § 5-227, prohibiting discriminatory practices (as defined in Conn. Gen. Stat. § 46a-51) in employment of state personnel.   And yet, while it appeared obvious to the Union President that discipline was meted out on a race basis in DCF, the Commissioner, though she knew of it [CHRO Testimony, p. ___ ], she chose to declare there was no problem, without stating how she came to know it.  There is plenty evidence that a

problem existed and that it was knowingly ignored at the highest levels.

Defendants cannot bring forth any evidence that DCF involved Affirmative Action Officers in this or any other termination, because there is no such evidence. Defendants cannot point to any program set up to rectify the employment termination problems that the Consent Decree was intended to rectify, because there is none.

In sum, there is more than enough evidence to go to the jury that Plaintiff suffered an adverse action at the hands of the Department and its Commissioner and managers and that such action occurred on account of race, and that this was part of a practice of the Department condoned at the highest levels.

### C.    PLAINTIFF'S CLAIM DOES NOT FAIL FOR LACK OF PERSONAL INVOLVEMENT OF DEFENDANTS

As noted above, by reason of her position as Commissioner, only Christine Ragaglia, and through her Wanda Estrella as Director of Personnel, had responsibility for implementing the portion [Part VIII] of the Consent Decree relating to the employment (hiring and promotion) of Social Workers.

There is evidence in this case that discipline was overtly biased against black minority personnel. The evidence is so strong that neither Wanda Estrella nor Christine Regaglia could have ignored it. In fact, given the transcript of the public testimony of Christine Regaglia to the Commission on Human Rights and Opportunities, she was aware of such complaints about discipline and simply declared them not true. There is no evidence in her statement that she ever ordered an investigation.

There is, then, plenty of evidence on which a jury could find that Christine Ragaglia and

Wanda Estrella personally interfered with the rights of Regina Whilby.

On the other hand, we maintain that it is not necessary to prove that Commissioner Ragaglia had been personally involved. It is enough to acquiesce in the discriminatory actions of others. In *Sorlucco v. New York City Police Dept.*, 971 F.2d 864 (2nd Cir.1992), the Second Circuit held the Police Commissioner of New York could be liable for acquiescence in the actions of subordinates.

> The policy or custom used to anchor liability need not be contained in an explicitly adopted rule or regulation. *See Ricciuti,* 941 U.S. at 123. Constitutional deprivations actionable under § 1983 may be "visited pursuant to governmental `custom' even though such custom has not received formal approval through the body's official decisionmaking channels." *Monell,* 436 U.S. at 691, 98 S.Ct. at 2036. So long as the discriminatory practices of city officials are persistent and widespread, they "could be so permanent and well settled as to constitute a `custom or usage' with the force of law," and thereby generate municipal liability. *Id.* (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 168, 90 S.Ct. 1598, 1613-14, 26 L.Ed.2d 142 (1970)); *see also* 1 M. Schwartz & J. Kirklin, *Section 1983 Litigation,* § 7.8, at 364 (2d ed. 1991) ("A persistent practice may constitute municipal policy whether it is carried out by the policymakers themselves, by other high-ranking officials, or even by subordinate employees."). However, before the actions of subordinate city employees can give rise to § 1983 liability, their discriminatory practice must be so manifest as to imply the constructive acquiescence of senior policy-making officials. *See Praprotnik,* 485 U.S. at 130, 108 S.Ct. at 927; *Krulik v. Board of Educ. of the City of New York,* 781 F.2d 15, 23 (2d Cir. 1986).

Id. @ 870-871. And,

> First, while the district court's statement is not completely clear on this point, its language suggests that the court required Sorlucco to demonstrate that the Commissioner, himself, was actively engaged in a pattern and practice of discrimination. To the extent that the district court employed such a standard, we reject it. While discrimination by the Commissioner might be sufficient, it was not necessary. As stated previously, a § 1983 plaintiff may establish a municipality's liability by demonstrating that the actions of subordinate officers are sufficiently widespread to constitute the constructive acquiescence of senior policymakers. *See Praprotnik,* 485 U.S. at 130, 108 S.Ct. at 927; *Krulik,* 781 F.2d at 23. Thus, Sorlucco did not have to prove that the Commissioner actively participated in the general discriminatory practice of his department.

18

Id. @ 871-872.

So it is enough if Defendant Ragaglia acquiesced in Wanda's Estrella's failure to implement Part VIII of the Consent Decree.  But, none the less, in the end the sole responsibility for that failure to implement lay with Defendant Ragaglia herself as Commissioner.  No one could implement it if she opposed it.

### D .    PLAINTIFF'S SEC. 1981 CLAIM IS VALID

### 1.    INTRODUCTION

Plaintiff submits that the 1991 amendments to 42 U.S.C. § 1981, in particular the addition of subsection (c) thereto, effects a reversal not only of the 1989 *Patterson* case, but also the 1989 *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701 (1989), to the extent that such ruling held that § 1983 provided the exclusive federal damages remedy for violations of § 1981 rights by state actors.

### 2.    DISCUSSION - 1991 AMENDMENTS AND *JETT*

*Jett, supra*, was the second of two 1989 decisions that galvanized the U.S. Congress into action. *Jett* held that claims of vicarious municipal liability under § 1981 had to be brought under the aegis of § 1983.

> The strong adverse reaction to the Sherman amendment, and continued references to its complete novelty in the law of the United States, make it difficult to entertain petitioner's contention that the 1866 Act had already created a form of vicarious liability against municipal governments.

*Jett* @ 727-8.

Congress acted swiftly. In 1991, Public Law 102-166 was passed . Section 3 of that Public Law states in relevant part:

> The Purposes of this Act are -
> (4) to respond to recent decisions of the Supreme Court by expanding the

scope of relevant civil rights statutes in order to provide adequate protection to victims of discrimination.

Note the plural reference in "decisions". It was not *Patterson* alone that irked Congress. And the addition of subsection (c) directly addresses *Jett*:

> (c) Protection against impairment
> The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

The parallel construction ["against impairment by ... and impairment under ... ."] makes it clear that § 1981 is now intended to provide direct protection against racial discrimination by state actors. We submit, if that is not the plain meaning of the words, then the words have no meaning.

Despite the cases cited by the Defendant - not one of which came from the Second Circuit, the Second Circuit Court of Appeals has taken the position that the 1991 Amendments to § 1981 do overturn *Jett*. Let us look at the Second Circuit treatment of this issue.

First, there is *Anderson v. Conboy*, 156 F.3d 167 (2nd Cir. 1998) is a case dealing with private actors, not state actors, and it does not attempt to interpret the effect of the 1991 Amendments on *Jett*. At most, it makes the following musing in footnote 19.

> [fn19] Section 1981(c) may be ambiguous as to whether it creates an implied private right of action against state actors under Section 1981, statutorily overruling Jett v. Dallas Independent School District, 491 U.S. 701 (1989),which held that 42 U.S.C. § 1983 provides the exclusive federal rights set forth in Section 1981(a). See Note 17, supra; compare Federation of African Am. Contractors v. City of Oakland, 96 F.3d 1204, 1205 (9th Cir. 1996) (Section 1981(c) overrules Jett), with Dennis v. County of Fairfax, 55 F.3d 151, 156 n. 1 (4th Cir. 1995) (Jett unaffected by Section 1981(c)). However, this ambiguity has no bearing on the issues before us.

*Id.* at 178.

So the issue was deferred by the court.

20

However, the Second Circuit has since then made its opinion known on the subject in explicit language and when they have done so, it is clear that in this Circuit, the new language provides rights under § 1981 against state actors.

The most recent word comes in *Dotson v. Griesa*, 398 F.3d 156 (2nd Cir. 2005), where the only reason that it denied the § 1981 claims of Plaintiff is that the Defendant was a federal actor and not a state actor:

> Title 42 United States Code § 1981(a) states: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." A 1991 amendment to § 1981 clarifies that "[t]he rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of *State law*" (emphasis added). 42 U.S.C. § 1981(c). This court has long construed the phrase "under color of state law" as used in related civil rights statutes, notably 42 U.S.C. § 1983, to apply only to state actors, not federal officials. *See Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30 n. 4 (2d Cir. 1991) (holding that "[a]n action brought pursuant to 42 U.S.C. § 1983 cannot lie against federal officers"); *Yalkut v. Gemignani,* 873 F.2d 31, 35 (2d Cir. 1989). Today, we hold that this construction also applies to the same language in § 1981. *See Lee v. Hughes,* 145 F.3d 1272, 1277 (11th Cir. 1998) (affirming dismissal of § 1981 claim by terminated U.S. probation officer: "Both circuit precedent and the text of ? 1981 compel us to hold that a plaintiff cannot maintain a § 1981 claim against a federal defendant acting under color of federal law."); *see also Davis-Warren Auctioneers, J.V. v. Fed. Deposit Ins. Corp.,* 215 F.3d 1159, 1161 (10th Cir. 2000) (affirming dismissal of § 1981 claim against federal agency); *Davis v. United States Dep't of Justice,* 204 F.3d 723, 725 (7th Cir. 2000) (same).

Id. at p. 162.

Earlier *in Phillip v. University of Rochester*, 316 F.3d 291 (2nd Cir. 2003), the Second Circuit looked at the opposite question, does the amended statute reach private action as well as state action:

> In 1991, Congress enacted amendments to Section 1981. The next just quoted now is denominated as subsection (a). A new subsection (b) repudiates Patterson v. McLean Credit Union, 491 U.S. 164 (1989), in which the Supreme Court held that breaches of contract are outside the scope of the

"make and enforce contracts" clause of Section 1981. And, pertinent to this appeal, a new subsection (c) provides: "The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law." 42 U.S.C. § 1981(c).

On the face of the amended statute, it would seem that the answer to the question this appeal presents is clear: No state action is required for a Section 1981 claim.

Id. at p. 294.

And again at p. 297:

The court also held that a contrary interpretation would have "the absurd result of federalizing state tort law." Id. Finally, the court relied on the legislative history for subsection (c). This history states in its entirety:

This subsection is intended to codify Runyon v. McCrary. In Runyon, the Court held that Section 1981 prohibited intentional racial discrimination in private, as well as public, contracting. The Committee intends to prohibit racial discrimination in all contracts, both public and private.

H.Rep. No. 40, 102d Cong., 1st Sess., Pt. II at 37 (1991), reprinted in U.S. Code Cong. & Admin. News at 549, 731.

From these holdings, it should be sufficiently clear that the Second Circuit Court of Appeals regards § 1981 as applying now to state actors and private actors both. Plaintiff, therefore, may pursue her claim in the alternative under § 1981 and § 1983.

## E.   PLAINTIFF'S 1981 CLAIM STATES A CAUSE OF ACTION

The argument put forward in Parts B and C of this Argument, relating to 42 U. S. Code § 1983 is incorporated here by reference as fully responsive to the Defendants' claims as to personal responsibility.

### F.    PLAINTIFF'S TITLE VII CLAIMS MEETS THE *REEVES* TEST

Defendants correctly state the application of *Reeves v. Sanderson Plumbing Products,. Inc*., 530 U.S. 133, 120 S. Ct. 2097, 2106 (2000) to the Title VII issues at hand.

The Plaintiff has clearly made a *prima facie* showing.  She is a minority, black; she was performing her job satisfactorily [Whilby Aff., ¶ 3 - 5 and this is not in dispute by Defendants]; she suffered an adverse job action, termination; the circumstances, that she was a black woman, and others who were white (and male) were not terminated, even though they did the same thing.  Even when Plaintiff informed the managers (as if they did not already know from the teachers that other people had done the same thing), they did nothing.  They did not rescind her termination; they did not discipline others.  There never was an intent to do so.  She was purposely selected, singled out, and got rid of.

Defendants make their real stand on pretext, claiming there is no way that Plaintiff can show pretext.  That is simply not so.  The evidence for that has been set out at length in Section B of this Part IV, above.   I will not go through it at length again, but will only summarize it.  First, the particular circumstances are so strong, with individuals named by Plaintiff who participated in the actions which she is alleged to have done, that those circumstances directly evidence a pretext.  Discipline was not uniform.  There was not even any discipline at all for others.  Indeed, there was no investigation or questioning of them.  The claim of non-discrimination in the face of Plaintiff's specific evidence of discrimination in the handing out of discipline is enough to raise a question of pretext in the termination.  On its face, the Defendants' claim of a valid, non-discriminatory reason is suspect in the circumstances.

In addition to that, from the specific numbered paragraphs in Section B,, it is evident that (1)

Hubblebank and Hamilton treated black trainees differently from white trainees; (2) the white instructor, Renee Huff, did nothing when a white person used the word "nigger" in a multicultural sensitivity class; (3) white trainees were not disciplined, let alone terminated, for using the internet or email in training classes; (4) the in class statements of Plaintiff about racial treatment by Hubblebank and Hamilton became known to them; (5) the 1991 Consent Decree evidences a longstanding racial imbalance problem at DCF; (6) the study conducted by Union President Sal Luciano showed that the race problem at DCF was alive and well as respects discipline of black personnel.   In addition to all this, it is submitted that Wanda Estrella's Affidavit, in so far as it deals with the magazine article, shows her racial hostility toward minorities, especially toward black women.

As also noted in Section B above, all this evidences a pattern and practice on the part of DCF to sanction such discriminatory practices.  There is plenty of evidence on which a jury may find that DCF did not have a valid, non-discriminatory reason for terminating Regina Whilby, and upon which they can affirmatively find that she suffered discrimination in her termination from state employment.

## G.    PLAINTIFF'S CFEPA CLAIM DOES NOT FAIL ON 11TH AMENDMENT GROUNDS

The Eleventh Amendment does not bar bring the action allowed by Conn. Gen. Stat. § 46a-100 to federal court.  The only case cited by Defendants in their favor on this specific issue is *Walker v. State of Connecticut*, 106 F. Supp. 2d 364 (D. Conn. 2000).  That decision is not binding in this case, as it is simply a decision of a judge of the same court.  There does not exist any ruling from an Appellate Court on Conn. Gen. Stat. § 46a-100.

Indeed, there are good reasons to believe that *Walker* is wrong. Chapter 814c of the Connecticut General Statutes, dealing with Human Rights, and establishing the Commission on Human Rights, for the purpose of prohibiting discrimination, subjects the State of Connecticut to the same law as any other person. There is no difference in treatment at all. In fact, there are affirmative provisions (§§ 46a-68 and 69) which bind state agencies to the whole panoply of remedies available to individuals claiming discrimination.

The provision of § 46a-100 allowing a claim to be withdrawn from the Commission and taken to court says nothing about the exclusivity of the state courts to hear this matter. The reference to state courts is simple. The state does not have the power to say that the individual can take his or her case to the U. S. District Courts. The jurisdiction of the federal courts is determined by federal law only. It is submitted that the court may take judicial notice of the fact that most cases are brought from the CHRO to federal court, not state court, under the pendant jurisdiction of the federal courts.

So, the real question is whether the State, having subjected itself on a equal basis to this law along with all other employers, then, without so specifying or notifying litigants, intended that upon removal of the case to the courts, that the plaintiff would have to bring a multiplicity of actions, filing his or her Title VII claim and its § 1983 claim in federal court, while having to duplicate that proceeding (with virtually identical proofs) as to the state claim in state superior court, incurring double (or more) costs and the extra burdens of going forward with two sets of pleadings and two practice and procedure rules that may conflict with each other? Is that outcome consistent with the obvious intent of the provisions laid out that a discrimination claim against the State of Connecticut should be handled with the same expeditiousness as a claim against any other entity? We declare

25

that it is not.  The State of Connecticut wrote this law to forward claims of individuals against it, not to *sub rosa* protect itself with technical defenses.  Given the liberal nature of the legislation, one would have expected an explicit protection of the State from court claims if that were intended.  There is none.

This reasoning applies only to the legislation in question.  Elsewhere the State of Connecticut has armored itself with protective legislation.  Here it has not.  A ruling in favor of Plaintiff here will not cause a flood of cases against the State to be brought to federal court, that otherwise would not.

### H.    COUNT TWENTY-TWO IS WITHDRAWN

Plaintiff withdraws Count Twenty-Two alleging intentional infliction of emotional distress.  Plaintiff acknowledges that the evidence has not developed so as to enable her to prove outrageous conduct in the process of her dismissal.

**PLAINTIFF**

**BY:**_____

Francis A. Miniter, their attorney
Miniter and Associates
100 Wells Street Unit 1-D
Hartford, Connecticut 06103
Telephone:   (860) 560-2590
Federal Bar No.: ct09566

26

**CERTIFICATION**

I hereby certify that a copy of the foregoing was sent electronically to the following this 27th day of November, 2007:

Joseph A. Jordano
Assistant Attorney General
55 Elm Street
P.O. Box 120
Hartford, CT 06141-0120


_____
Francis A. Miniter

27