UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RYAN WILLIAMS | : | CIVIL ACTION NO: |
| | : | |
| vs. | : | 3:01CV 1398 (JBA) |
| | : | Magistrate Judge Margolis |
| KRISTINE REGAGLIA, | : | |
| COMMISSIONER, DEPARTMENT | : | |
| OF CHILDREN AND FAMILIES | : | |
| and IN HER INDIVIDUAL | : | |
| CAPACITY, ET AL | : | November    , 2007 |

**REGINA WHILBY'S AFFIDAVIT IN RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

The undersigned, being duly sworn, makes oath and declares as follows:

1. I am over the age of eighteen years and I understand and respect the obligations of an oath.

2. I am one of the Plaintiff's in the above-captioned action and have personal knowledge of the facts set forth herein, except as I may explicitly qualify a statement as being made on information and belief.

3. I am a black, African American woman and citizen of the United States.

4. I was hired by Defendant DCF and began to work as a Social Worker Trainee on January 28, 2000, to work in the Bridgeport office.

5. I performed my work as a trainee in a satisfactory manner. I never received a performance evaluation.

6. In February, 2000, as part of the training, I attended a Cultural Diversity Training course. The instruct or was Ms. Renee Huff.

7. During one class session, there was a discussion concerning interracial matters in

1

the workplace. I spoke up during that class. I complained about discrimination that I had observed at DCF prior to that class.

8. What had happened was that one of my co-trainees, an African American, and I approached our supervisor, Ms. Beverly Hubblebank, who told us to go to her supervisor, Ms. Dorothy Hamilton, to ask her to sign our timesheets so that we could be paid overtime. We did so. Ms. Hamilton took the timesheets and put them in a basket on her desk, saying she would get to it later. As we left her office, two white co-trainees came into her office with the same request. Ms. Hamilton signed them immediately as we watched. This shows an innate distrust of black people by Ms., Hamilton as well as racial discrimination in actual treatment of employees.

9. As I was upset by it, I brought this up for discussion in the training class. I was later told that my statement had become known in the Bridgeport office and discussed there. At that class, Jeff Smythe, a white trainee, used the word "nigger" and he was not corrected by the class teacher. He also said that this training was pointless. I went to the teacher afterward but she did nothing.

10. On or about March 6, 2000, I was in mandatory attendance in a training class in Hartford, called Introduction to Personal Computers. There were about seven (7) trainees in attendance. The instructor was Ms. Romelia Sharpe.

11. On her direct instruction, we performed various internet functions, including going to web sites and learning about address locations. While Ms. Sharpe stood behind myself and Raul Parks, I and he established a Hotmail internet account for him. Ms. Sharpe assisted. Another person, Marsha Martelli, was getting married, and used the Internet to conduct research for her wedding and invitations, including printing of materials.

12. During the breaks between segments of the instruction, the entire class continued to access the Internet, with many of us checking our personal emails and printing from a variety of sites.

13. At no time before the events just described did Ms. Sharpe or any other person instruct us that this was not acceptable conduct. In fact, she had encouraged us to do so and specified certain non-work related web sites as examples by writing them on the board, including bluemountain.com, bearisland.com, and yahoo.com. I never saw restrictions on personal use of computers posted anywhere in the classrooms that we used. Neither Ms. Sharpe nor any one else had brought it to our attention, and the encouragement that she gave us would have made any of us believe that any restrictions would not apply to the learning period.

14. On Wednesday, March 9, 2000, I was in mandatory attendance in another training class in Hartford, Introduction to Word. Again, we were allowed during the breaks to access various internet sites during that class. The instructor was Mr. James Desmond.

15. Again, as in Ms. Sharpe's class, the trainees all continued to access the Internet during the breaks, including email accounts. Again, neither Mr. Desmond, who was watching us, nor anyone else said that we should not be doing so.

16. I know with absolute certainty that two co-trainees, Marsha Martelli and Jeffrey Smythe, both of whom are white, participated in activities that were later declared to be inappropriate. I saw Marsha Martelli print out an email that she had received. This was done in the presence of Mr. Desmond. Neither of them were disciplined.

17. On Monday March 13, 2000, I was again in another mandatory class, Introduction to Link. Ms. Sharpe instructed. On that same day, Jeff Smythe sent me and several people in the class an email saying in capital letters and in a very large font (40 points or so) that this is

boring.

18. Later that day, in a class with Mr. Desmond, Mr. Desmond said that two people were in trouble. At least one of them is in big trouble.

19. This time, during one of the breaks, Ms. Sharpe told us not to access the Internet during the breaks. At that point, we stopped. Ms. Sharpe herself sent us an email using graphics, in this case a leprechaun. I understand from the written policy that graphics are forbidden.

20. On March 14, 2000, I was called into a meeting in the Bridgeport office of DCF with Beverly Hubblebank, Dorothy Hamilton and Judith Kallen. I was immediately told that my employment was terminated for misuse of state property by accessing the Internet..

21. I told them that all of the class had done so and that it was not prohibited by the teachers. I also told them it was unfair to fire me as an example. I did not admit to "inappropriate conduct". They claimed that the only evidence they had of any trainee accessing the Internet pointedust to me. This was incredible as Mr. Desmond watched all of us do the same thing and had directed Jeff Smythe to stop at one point, and the email in question was not even printed by me.

22. Wanda Estrella claims (Affidavit, ¶ 9) that I participated in an action that was degrading to white women by printing an article on interracial dating. That is false. I had received an email commenting on this article, which was published in a national magazine. The concern of the email was that black women, not white women, were badly portrayed in the article. I did not print the article but kept it to read it when I had no work obligations. I did forward it to another trainee, Marcia Taylor, who did print it. That is Defendants' Ex. 3, which was an email to her from me, and which she printed through her service - Excite. Mine was

AOL. No punishment was given to her. I was not participating in any disparagement of black men or black women or interracial dating. The attitude of the writer of the article was very troubling to me and I had already heard about it from other African American women who had discussed it. The fact that Wanda Estrella considered the article disparaging of white women, in spite of Defendants' Ex. 3, evidences a racial motivation for her action in participating in my termination.

23. Wanda Estrella further claims that I left this "racially charged" email out for others to see. I did not leave it out. Wanda Estrella was not present and could not possibly swear under oath that I did so, even though she has done so. Her sworn statement is false.

24. The State of Connecticut sent me a letter the following day stating that I was terminated.

25. I met afterwards with Wanda Estrella. At that meeting, she asked me if I knew that this was prohibited. I told her that I was participating in the class work and denied that I knew it to be wrong.

26. When Wanda Estrella states that Jeff Smythe did not access his personal email and did not print a document, she is not making a true statement. I saw him do so myself. He sent graphics and large emails to friends.. Mr. Desmond told him to stop. He was not punished. Wanda Estrella was not present and does not have the ability to swear under oath what Jeff Smythe did or did not do.

27. I know of no other emails which involved me. Defendants have made reference to an email printed by Mr. Desmond with my name on it, but I know nothing of this email.

                                                  _____/S/_____
                                                  REGINA WHILBY

SUBSCRIBED TO AND SWORN
before me a Notary Public on this 08th
day of November, 2007.
_____/S/_____
John W. Wimberly
A Notary Public: My Commission Expires: 11-05-2010